MAUDE F. GAUGH v. GEORGE M. GAUGH (Impleaded with WALTER W. GAUGH ET AL.), Appellant, and KARALEE RANKIN.—11 S. W. (2d) 729.

Court en Banc, November 24, 1928.

*Hackney & Welch* for appellant.

*John S. Wise, Jr.,* for respondent.

LINDSAY, C.—The respondent, Maude Gaugh, is the widow of George G. Gaugh, deceased, who died intestate, leaving as his only heirs the other named parties, Walter W. Gaugh and George M. Gaugh, his sons, and Karalee Rankin, a daughter.

The decree herein appealed from by George M. Gaugh adjudged that he held title to a certain farm in Jackson County in trust for his father, George G. Gaugh, in the latter's lifetime, and thereafter in trust for the widow and heirs of his father, and that decree also cancelled a conveyance made by Maude Gaugh to George M. Gaugh of all her interest in the estate of the deceased.

George G. Gaugh was a judge of the County Court of Jackson County in the years 1919 and 1920, and throughout the testimony is generally referred to as Judge Gaugh; George M. Gaugh is general-

418

ly referred to as Mort Gaugh; the farm in question is referred to as the Courtney farm; and for brevity and certainty of statement they will be so referred to herein.

Prior to his election as county judge in 1918, for thirty years or more, Judge Gaugh operated a printing and binding establishment in Kansas City. His two sons, Walter and Mort Gaugh, assisted their father in the business from the time they were boys, but appear not to have drawn salaries. Walter Gaugh was forty-five years old at the time of the trial, and Mort Gaugh was forty-one years old. Karalee Rankin, the daughter, was younger; was married ten or more years prior to the trial, and lived in New York City with her husband, Earl Rankin.

Maude Gaugh was the second wife of Judge Gaugh. Their marriage occurred about 1900. The three defendants in the suit were children of a former wife of Judge Gaugh, who had divorced him, but who was living at the time of the trial, her name then being Carrie M. Knox.

The printing and binding business referred to was carried on at 408-410 Admiral Boulevard, Kansas City. From June, 1917, the title to the undivided one-half interest in the real estate known as 408-410 Admiral Boulevard was in the Queen City Building & Investment Company, a corporation, which also, after the date mentioned, held title to the adjoining property, 404-406 Admiral Boulevard. One Henry A. Fratcher owned an undivided one-half interest in the property at 408-410 Admiral Boulevard. After January 1, 1919, the printing and binding business was done by Walter Gaugh and Mort Gaugh under the name of Union Printing & Binding Company, which was not a corporation. It had formerly been George G. Gaugh Printing & Binding Company.

Judge Gaugh died on September 12, 1922. On October 9, 1922, Maude Gaugh brought this suit, joining the three heirs as defendants, and alleging that Judge Gaugh died being the equitable owner of certain tracts of land bought with his own money. though title to certain of the lands was in the name of Mort Gaugh, and certain other in the Queen City Building & Investment Company. Demurrers were filed and sustained by the court, and plaintiff, on November 24, 1922, filed her amended bill, omitting the Queen City Company as a party, and omitting the real estate, the title to which was alleged in the original bill to be in the Queen City corporation. The first amended bill thus covered property only which was alleged to stand in the name of Mort Gaugh—the Courtney farm, and certain property in Ashburn's Addition in Kansas City, and referred to by the witnesses as the Ninth Street property.

Maude Gaugh qualified as administratrix, and as such. on October 16, 1922, brought another suit joining the three heirs as defendants,

and alleging that legal title to certain personal property, shares of the capital stock of the Queen City Company, and also certain other personal property, the property used in the printing and binding business and belonging to that business, held by the defendants, was actually the property of Judge Gaugh and asked that the defendants be adjudged to hold said personal property in trust for the administratrix, and for the estate of the deceased. In that suit the court found that Walter Gaugh and Mort Gaugh were owners of the Union Printing & Binding Company property, but found that Judge Gaugh owned the stock of the Queen City Company and that appellants held the stock under a constructive trust. That cause is here as Seehorn, Administrator, Respondent, v. Walter W. Gaugh and George M. Gaugh, Appellants, Karalee Rankin, Respondent, *post* page 456.

On December 28, 1922, Maude Gaugh filed her election as widow, electing to take a share in the estate equal to that of a child of the deceased, and also on that day, pursuant to an agreement made with Mort Gaugh, and for a consideration of $12,900 paid to her by him, conveyed and assigned to Mort Gaugh all of her interest and claims to the estate of the deceased. About that time also she resigned as administratrix, and Mort Gaugh was appointed administrator in her stead, and both suits languished for a time. Prior to this transaction, Maude Gaugh had taken the depositions of Walter Gaugh and Mort Gaugh and of some other persons. In this, the land suit, Walter and Mort Gaugh had answered, denying that their father was the owner of the lands sought to be subjected to a trust—the Ninth Street Property, in Kansas City, and the Courtney farm—and Mort Gaugh answered, claiming to be sole owner of said properties.

In April, 1923, Karalee Rankin also took the depositions of Walter Gaugh and Mort Gaugh, and of certain other persons concerning transactions preceding the death of Judge Gaugh, and immediately following his death, and concerning also the claims of Walter Gaugh and Mort Gaugh to the shares of stock in the Queen City Company, and to the printing and binding business, and other property. On June 25, 1923, Karalee Rankin filed, in this suit, her answer and cross-bill, in which she alleged that Walter Gaugh and Mort Gaugh and the Queen City Company were not the owners of the real properties, but merely held the title thereto for convenience and in trust for her father, Judge Gaugh, and asserted her claim to an interest in said properties as an heir of the deceased. Walter Gaugh and Mort Gaugh answered to the cross-bill, the latter claiming to own the real estate. Karalee Rankin also filed answer and cross-bill in the administrator's suit for personal property, alleging that Walter Gaugh and Mort Gaugh were in pos-

session of the legal title to certain shares of stock in the Queen City Company, but held the same in trust, denying that Mort and Walter Gaugh were the owners, of shares of stock in the Queen City Company, or of the properties appurtenant to the printing and binding business; also alleging that they had wrongfully taken possession of the same, and of other stocks, bonds, and properties of Judge Gaugh, and asserted her interest in said personal property as an heir of her father.

The defendants Walter and Mort Gaugh filed their answer to the amended answer and cross-bill of Karalee Rankin. They averred that in May, 1917, Walter Gaugh was the absolute owner of an undivided one-half interest in Lot One in McTernan's Resurvey, an addition to Kansas City, and that Mort Gaugh was the absolute owner in fee simple of Lot Two and the east 20 feet of Lot Three, in said Resurvey. These properties are the properties above mentioned and otherwise described as 404, 406, and 408, 410 Admiral Boulevard. They further averred that Mort Gaugh was the owner of certain real estate in Sharon Place, an addition to Kansas City; that in May, 1917, their father, Judge Gaugh was the owner of the charter and of the capital stock of the Queen City Building & Investment Company, which, in fact, had no assets; that it was agreed between the defendants and their father that if they would convey the property last above mentioned to the Queen City Company, the defendants should be the absolute owners of all the capital stock of said company, and that if any shares of stock were held thereafter in the name of their father, he would hold the same in trust for them; that pursuant to the agreement that they would convey said real estate to the Queen City Company, their father agreed, in consideration of said conveyance, to assign and deliver and cause to be issued to the defendants all of the capital stock of the Queen City Company, except one share which the defendants agreed might be issued and held in the name of their sister Karalee Rankin; that defendants requested their father to remain as president of said Queen City Company during his lifetime; and, to qualify him for that, desired he should retain shares of stock. Their averment and contention was that under this agreement with their father, out of the eighty shares of stock of the Queen City Company, one share was issued and delivered to each of the sons, and one share to Karalee Rankin; that the certificate for the remaining seventy-seven shares was issued to, and stood on the books in the name of, their father; that about June 11, 1917, pursuant to the agreement, and upon conveyance of said real estate to the Queen City Company, the certificate for seventy-seven shares, standing in the name of their father, was cancelled, and two certificates, each for thirty-eight and one-half shares were issued to their father; that their

father thereupon assigned these two certificates for thirty-eight and one-half shares each, to defendants, respectively, and delivered them to defendants Walter Gaugh and Mort Gaugh, but that said certificates, pursuant to the agreement with their father, were to be, and were permitted to remain and stand upon the books of said corporation, in the name of their father. They averred that on the 11th day of June, 1917, their father did declare and create a trust in favor of the defendants in equal parts, to all of the stock in the Queen City Company issued in his name. It was further averred that defendant Mort Gaugh, in May, 1919, was also the owner of an undivided interest in certain other real estate, in N. Corder Place, an addition to Kansas City, and at that time executed to the Queen City Company a conveyance of that interest; and did so, on the faith of the ownership by him and Walter Gaugh, of all the capital stock of said Queen City Company. It was averred that the aforesaid property constituted the sole assets of the Queen City Company; that their father contributed nothing in money or property to the capital stock of said company. They further averred that thereafter out of their own separate means, they placed to the account and credit of the Queen City Company from time to time various sums of money, belonging to them, and which was used and controlled by them as their own property by virtue of their ownership of all the capital stock of the Queen City Company. They further pleaded the five-year Statute of Limitations in support of this claim of ownership of the seventy-nine shares of the capital stock of said Queen City Company. They further alleged that in consideration of their services to their father through many years, in the printing and binding business, he had agreed to convey to them the property and the good will of that business, and that he did, in December, 1918, transfer and deliver to them that property, and then pleaded the execution and delivery to them of a bill of sale of the business and goods and chattels used in said business; that thereafter said property belonging to the printing and binding business was owned and controlled by them, and their father had no legal title thereto.

The two cases were taken up for trial in June, 1923, being mainly prosecuted by Karalee Rankin, and heard together, and a great volume of testimony was taken, and both cases were taken under advisement by the court. Nothing further was done until October 9, 1924, when Maude Gaugh filed in this suit her second amended bill, in which after substantially repeating her former allegations, she alleged that her conveyance to Mort Gaugh, made on December 28, 1922, was obtained by fraud, and asked its cancellation. This was asked upon the claim that the defendants had falsely stated to her that they, and not their father, were the owners of this personal property, including the shares of stock in the Queen City Investment

Company, and owners of the printing business, with the equipment, machinery and the like, and owners of the real estate, and had represented that their father, Judge Gaugh, had no interest in the real estate, mentioned in the amended petition, but that the same belonged to defendant Mort Gaugh. She also alleged that defendant Mort Gaugh had fraudulently concealed from her the fact that the deceased, at his death, was the true owner of the said property, and that said Walter Gaugh had wrongfully withdrawn, from the safety deposit box of deceased, liberty bonds and other securities, and that defendants Walter Gaugh and Mort Gaugh had destroyed or secreted book accounts, books and documents belonging to the deceased, and concealed from her the facts of ownership of property by the deceased. The amended bill did not offer to return the $12,900, but alleged that the plaintiff Maude Gaugh was ''willing to account to the administrator of the estate or to the co-heirs of the deceased, for the $12,900,'' and also averred that her ''share of the personalty of said estate was worth $50,000, and far exceeded the said sum of $12,900.''

Defendants answered. Defendant, Mort Gaugh, filed his separate amended answer to the amended petition of Maude Gaugh, and to the cross-bill of Karalee Rankin, denying the allegations of fraud, and averring that plaintiff Maude Gaugh, had full knowledge of the facts at the time she made the conveyance.

Meantime, Mort Gaugh was removed as administrator, and Thomas J. Seehorn, as public administrator, had been ordered to take charge of the estate of the deceased; and, on September 30, 1924, as such, filed the administrator's second amended petition. In that petition there was set up ownership by Judge Gaugh of the printing business and equipment, the shares of stock in the Queen City Building & Investment Company, and ownership also of other properties; and it was charged that the defendants had procured false and forged assignments of the certificates of stock in the Queen City Building & Investment Company, and had wrongfully taken possession of them, and of large amounts of liberty bonds and other securities belonging to the deceased, and it was asked that the defendants be required to account for the same, and to hold the same in trust for the estate.

After the filing of the last amended bill by Maude Gaugh in the land suit, the court heard additional evidence and especially evidence concerning the transaction between Maude Gaugh and Mort Gaugh resulting in the conveyance made by her to Mort Gaugh on December 28, 1922. Both cases were then held under advisement until February, 1925, when the court rendered judgment in each—in this cause, the land suit, adjudging that Judge Gaugh at the

time of his death was the beneficial owner of the Courtney farm, and that Mort Gaugh held the legal title thereto in trust; and the court also decreed cancellation of the conveyance from Maude Gaugh to Mort Gaugh, as to both real and personal property.

In the other case of Seehorn, Administrator, the court found for the administrator as to the ownership of the shares of stock in the Queen City Company, but found for defendants Walter Gaugh and Mort Gaugh as to the chattel property and business carried on under the name of the Union Printing & Binding Company. The two cases, although separate decrees were rendered, were heard together. The testimony is presented here in a single bill of exceptions; and upon appeal they were heard and submitted together. Throughout the nine hundred pages of oral and documentary evidence, the transactions bearing upon the issues in each of the two cases are so related, and so mingled that neither can be intelligently presented without constant reference to the issues and the testimony in the other. As we view it, the finding and decree in this case carry conclusions decisive of all important issues in the administrator's case. For that reason, the issues, the evidence and the conclusions are stated herein.

In this suit, the ultimate purpose of the plaintiff, Maude Gaugh, was to cancel the conveyance by her to Mort Gaugh, of her interest in the whole estate under her election to take a child's part, and as a means to that end, and reason therefor, to establish a trust in certain real estate—the Courtney farm, and the property in Ashburn's Addition, referred to as the Ninth Street property—the legal title to which was in Mort Gaugh; and also to establish ownership of her husband of the personal property referred to, followed by the allegation that Walter Gaugh and Mort Gaugh had concealed the facts; and the latter, by false representations made to her concerning the property, had induced her to convey to him her claims upon the estate. The cross-bills of Karalee Rankin sought the same end, except as to annullment of the transfer from Maude Gaugh to Mort Gaugh, a transaction in which she was not legally concerned.

The evidence as to the ownership of the real estate dealt with a great number of transactions covering many years, but concentrating upon the question of ownership of the Courtney farm and the Ninth Street property; and also upon ownership of the real estate conveyed to the Queen City Company.

Mort Gaugh took title to the Ninth Street property on June 28, 1922, by conveyance from one Elmer Grant Ege. He took this property in exchange for a farm held by him, referred to as the Lone Jack farm, and there was paid to Ege the sum of $10,000 as the difference in price of the two properties. This $10,000 paid to Ege was borrowed from the Pioneer Trust Company, upon a note of the Queen City Company, executed for that company by Judge Gaugh as its president

and Walter Gaugh as secretary, and also signed by Judge Gaugh and Mort Gaugh as individuals. At the time they procured this loan, Judge Gaugh and Mort Gaugh made written statements as to their financial condition and of the properties owned by them. While the trial court found in favor of Mort Gaugh as to ownership of the Ninth Street property, and respondent did not appeal, this transaction is mentioned at this time, because further reference will be made to the financial statements of Judge Gaugh and Mort Gaugh in their connection with other evidence.

We notice the evidence concerning the acquisition of the Courtney farm. The testimony shows that Mort Gaugh contracted for the purchase of the Courtney farm from one Charles A. Brunn, on April 30, 1919, under a contract in writing of that date, and that the purchase price was $21,000, of which $1000 was paid at the signing of the contract; $6000 was to be paid on delivery of the deed; $7000 was to be paid in one year and the further sum of $7000 on or before two years, for which notes were given secured by a deed of trust. The deed from Brunn to Mort Gaugh was made May 7, 1919. Mort Gaugh called as a witness by respondents early in the trial, testified concerning this transaction, and said that he bought the farm for himself; that he negotiated its purchase with J. G. Murphy, who was the agent of Brunn. Murphy, afterward called as a witness, testified that as the agent of the owner he dealt with Mort Gaugh in the purchase of the farm, and that Judge Gaugh had no part in the negotiations or purchase; that he had nothing to do with Judge Gaugh in that regard. Brunn also testified. He identified the cancelled check for $1000 given as the first payment. He said that Judge Gaugh had nothing to do with the transaction of buying the farm, and that he never met Judge Gaugh until later, some time in the fall following the sale of the farm. In the examination of Mort Gaugh there were introduced in evidence the original cancelled checks given by him in payment of the Courtney farm. The first of these for $1000 was a check drawn by Mort Gaugh upon the account of the Union Printing & Binding Company. The check for $6000 on the same bank was a check of the Union Printing & Binding Company, by Mort Gaugh. The cancelled note for the first deferred payment for $7000 was also introduced in evidence. This note had been held by and was paid to the Mercantile Trust Company of Kansas City. The cancelled check for the final deferred payment of $7116.67, principal and interest, was the personal check of Mort Gaugh on the Missouri Savings Association. He testified that he leased the farm to tenants, and managed it, and planned and paid for extensive improvements made upon the farm. He introduced in evidence a great number of cancelled checks which he testified were given in payment of expen-

ditures made on the Courtney farm for tools, machinery and general improvements, equipment, live stock, labor and the like. The greater number of these were checks by the Union Printing & Binding Company, a few of them drawn by Walter Gaugh—the remainder by Mort Gaugh for the company. These checks covered the years 1919, 1920, 1921 and 1922, and in the aggregate amounted to more than $11,000. He also introduced in evidence the checks given by him drawn on his own account in other banks during the years mentioned, for payments made connected with the improvements and management of this farm. These in the aggregate amounted to nearly $6000.

Chas. W. Scoffield testified that he owned a tract of land adjoining the Courtney farm; that upon one occasion he went to the house on the farm for the purpose of getting permission for a drive-way off the farm, where it cornered upon his own land; that he found Judge Gaugh and Mort Gaugh there together, and spoke to Judge Gaugh, asking what the chance would be to get the drive-way off of his land; that Judge Gaugh replied: "The farm belongs to Mort, my son. You can see him. I do not presume you will have any difficulty in getting a drive-way." He said that before he "spoke to Mort or asked any questions, Mort spoke up and said: 'Yes, go ahead and fix your drive-way there.'" The witness said that on another occasion he spoke about certain hogs on the place that he wished to buy, and Judge Gaugh told him to go with his son, and "look the hogs over; they belong to him." He testified to another occasion when there was some discussion between Mort Gaugh and himself as to his renting the Courtney farm; that later, he went to the office on Admiral Boulevard, and Mort was not in the office at the time, but that Walter Gaugh and Judge Gaugh were in the office; that when he said he came "to talk about renting the farm," Judge Gaugh answered: "You will have to see my son Mort; the place belongs to him," and that later Mort Gaugh came, and he went ahead and rented the farm that day. There was also introduced a bill of sale from one Holmes of his interest in certain live stock and implements to Mort Gaugh for the consideration of $2,250. It appears that Mort Gaugh in the purchase of this farm obtained a title guaranty. This document with an envelope, the envelope in which it was contained, was introduced in evidence. This envelope bore indorsed upon it memorandum in the handwriting of Judge Gaugh, the words, "Property of Geo. M. Gaugh." Mort Gaugh testified that on June 28, 1922, at the time of the exchange by Mort Gaugh of the Lone Jack farm for the Ninth Street property, and the procurement of the loan for $10,000 from the Pioneer Trust Company, to pay the difference, he and Judge Gaugh were together, when they made the written financial statements to the Pioneer Trust Company above

mentioned. The statements were introduced in evidence. In the statement made by Judge Gaugh he listed as real estate owned by him, and in his own name, five pieces of property in Kansas City, and also a brick building at 304 Main Street as being in his wife's name. In this statement he made no mention or claim of ownership to the Courtney farm. He listed as personal property $5000 of United States bonds. He made no claim of interest in or mention of the Union Printing & Binding Company property. The clear value of the property so listed was stated to be $56,000. In Mort Gaugh's financial statement he listed as owned by him, the Courtney farm and also the Lone Jack farm, the stated clear value of the two being $77,000. He also listed one-half interest in the Union Printing & Binding Company at a valuation of $12,500, a Farm & Home Savings & Loan Association certificate for $5000, and cash on hand $2000, or a total of $89,500. The real estate listed by Judge Gaugh as held by his wife was property to which she took title about the year 1902. After the death of Judge Gaugh she sold this property for $19,000, which she retained. Neither Judge Gaugh nor Mort Gaugh in their statements made reference to ownership of shares or of an interest in the Queen City Company, and this presumably because that company was the principal maker of the note.

Walter Gaugh testified that Mort Gaugh bought and paid for the Courtney farm and the Lone Jack farm. Mort Gaugh testified that he had never taken title to any property bought by his father.

A great deal of evidence was introduced directed to the end of showing the financial condition of Judge Gaugh and of Mort Gaugh as well, in the years preceding the death of the former. The respondents claim that Judge Gaugh had ample means and owned all the property, and that his sons had little or nothing. The Federal Income Tax returns made by Judge Gaugh for the years 1913 to 1921, inclusive, were introduced in evidence. These returns showed net income of Judge Gaugh in 1913 of $4,250; in 1914, $6,192.89; in 1915, $5,915.03; 1916, $3,272.47; in 1917, $4,748.30; 1918, $4,059.b9; 1919, $1,944.48. In 1920 there was a non-tax report, and in 1921 the return was $1,641.13. In all of these except for 1913, he included the income of his wife. In all of them from 1913 to 1918, inclusive, he included the net income of the printing and binding business. The return for the year 1919 did not contain a return of income from the printing business and did contain the notation: "Printing business sold January, 1919." Rents were included in these statements, but the specific properties from which the rent was received were not stated, prior to the return for 1917. In that return the properties listed as producing rents were, 4512-14 Forest Avenue; 3339 Paseo; 304 Main Street and what is spoken of as the Grandview farm. Judge Gaugh also owned property at 3341 Paseo,

but occupied it as his homestead. He traded the Grandview farm in 1917 for the house at 4512-14 Forest Avenue. In the return for 1918 the rents were shown as for the same properties as those described in the return for 1917, except the Grandview farm. The return for 1921 did not specify the properties from which rent was received, but he returned as rents received for store rooms, $950; residences $1,330; total repairs, $628.27. The return for 1919 included the item of $4,254.90, salary as county judge. The return for 1913, showed an item "gains and proceeds, partnership business $1000," and the returns for 1914 to 1918 inclusive, showed interest received by him in each year, but in each year the amount received was less than $100. The returns for 1913, 1914 and 1915 showed a credit in each year for interest paid, the amount in each year being in excess of $200.

The county treasurer was called to testify as to what the books showed of the income of the Gaughs for tax returns to the State. In 1917 Judge Gaugh's name did not appear. In 1918 an income of $260; in 1919, $2,344; in 1920, $3,790. There was no return for 1921. Mort Gaugh's name was not on for income tax in 1918, but in 1919 his name appeared for an income of $2000, which the witness said was abated by the assessor in full—reason not shown. He was not on the books for 1920, and in 1921 his return was $537. Walter Gaugh's name was not on the books for 1917 and 1918, but was on the books for an income of $888 in 1919 and $681 in 1921, but not on the books for the year 1920. The Union Printing & Binding Company was not on the books for the year 1919, 1920 or 1921. The Queen City Company was on the books for an income of $455 in 1917; not on for the year 1918, but was on for $174 for the year 1919; $1000 for the year 1920, and $613 for the year 1921. The testimony showed that during a considerable period of years preceding his death, Judge Gaugh had bought and taken title in his own name, and afterward sold, a number of pieces of real estate. These included the Grandview farm, also a farm of forty acres spoken of as the Selsa farm, and certain properties in Kansas City—a property on Vine Street, one on East Eleventh Street, 2909 Forest Avenue, 3009 Benton Avenue, 219 Main Street, and an interest in a lot at Third and Wyandotte Streets.

The evidence showed that Judge Gaugh acquired and took in his own name the two houses on the Paseo, in the years 1900 and 1905. respectively, and the properties at 4512-14 Forest Avenue in 1917. The last of the properties taken and held by him in his own name at the time of his death were the Grand Avenue buildings. This was conveyed to him in October, 1921, for an expressed considera-

tion of $10,750, subject to a mortgage for $5,500. These were the properties referred to in his financial statement to the Pioneer Trust Company on June 28, 1922.

In passing from this phase of the evidence as to title to the property, it may be mentioned that Karalee Rankin in her testimony hereinafter referred to, stated the title to the Courtney farm and other property claimed by Mort Gaugh was placed in Mort Gaugh, because of the existence of differences between Judge Gaugh and plaintiff Maude Gaugh, and because of her unwillingness to join her husband in conveyances; but, aside from the testimony of Karalee Rankin on that point, there is no evidence that Maude Gaugh refused to join in a conveyance of property held by Judge Gaugh in his own name, or that he put title in some one else, because of differences with his wife. Related to this point, however, is the fact that it appears Maude Gaugh claimed, as a provision made for her, the property at 304 Main Street, which Judge Gaugh had caused to be conveyed to her in 1902, which, as heretofore stated, she sold, and received the proceeds of the sale.

There is another transaction concerning which much testimony was given. This was the purchase, about 1912, of a farm in Kansas spoken of as the Humbolt farm. Apparently, it was bought on the theory that oil would be found. The title was taken in the name of Mort Gaugh, and Fratcher, heretofore mentioned, was also interested in it, and it appears two other men, one Vance and one Watkins. Fratcher testified that all of them, including Judge Gaugh, went to look at the farm. According to the testimony of Mort Gaugh, some misunderstanding arose as to the price and Judge Gaugh did not go forward in the purchase of it. The total price paid was $10,000. Fratcher's testimony seems to indicate that Judge Gaugh was concerned in the purchase, and payment of some part of the purchase price, but this is not wholly clear. They drilled upon the land and no oil was found. Fratcher says that he and Mort Gaugh bought out the interest of Vance and of Watkins. This property was afterwards traded for property in Kansas City, mentioned as the Norgrove Apartments and conveyed to the Queen City Company. However, as to the Humbolt farm, the tenant on that farm, held for two or three years before being traded for the Norgrove Apartments, testified that he paid the rent to Judge Gaugh.

Much evidence was introduced by the respective parties as to the financial condition of Mort Gaugh. Respondent put in evidence the record of his savings account with the Missouri Savings Association Bank from May 19, 1915, to July 1, 1923. The largest balance shown during the year 1915 was $882.66, and the balances at times were down to small amounts of only a few dollars. In 1916 the largest balance shown to the credit of Mort Gaugh was $1,125.44 on January

11, 1916. Thereafter, in that year, the balances shown were lower, running between $200 and $500, ordinarily. In 1917 the balances varied between approximately $100 and $800. In 1918 the highest balance shown was $1,213 26, and at the end of the year the balance was $1,050. Between those dates the balances varied, running ordinarily between $300 and $800. In the year 1919 the balances shown increased from $1,060 at the beginning of the year, to $5,351.53 on May 5th. Thereafter, during the year balances ran approximately between $2500 and $5000, but about the end of the year reached $8000 and remained near that sum during the early part of 1920. After April, 1920, and during the remainder of that year the balance varied from $100 or less to somewhat more than $1000. In 1921 the balances ran between $356 and $1024. In 1922 the balances given at the few dates shown during that year ran ordinarily between $100 and $500. In 1923 the few items showed a balance of only eight dollars and some cents.

Mort Gaugh testified that he had kept a savings account with the Missouri Savings Association for about twenty years, but the record for the years preceding the year 1915 was not shown. It appears from the testimony of the bank official that the book could not be located, but he said Mort Gaugh had an account in 1912 and perhaps 1911. The testimony showed that the check by Mort Gaugh for $2250 given on December 3, 1912, as part of the purchase price of the lots bought of McTierman, being the property at 404-406 Admiral Boulevard, was drawn upon the Missouri Savings Association Bank. The cancelled check was produced in evidence showing McTierman's indorsement thereon, and its payment. Appellants introduced in evidence the checking account of Mort Gaugh on the Missouri Association Bank. This was an account running from January 2, 1918, to May 11, 1923. The balances shown varied, running at times in excess of $1500, and during the latter part of the period between $200 and $800. Appellants also introduced a record of Mort Gaugh's account with the Fidelity National Bank of Kansas City, beginning in 1909, and running down to August, 1922. This seemed to be an active account but at no time was there shown a balance in excess of $1000, and frequently the balance was $100 or less. Mort Gaugh seems also to have had a checking account with the Central Exchange Bank in the year 1919, and for some time thereafter. The checks given by him in payment of labor employed in the improvement of the Courtney farm appear to have been given upon this bank. In a similar way he had an account and gave checks upon the Home Deposit Trust Company. This was in the year 1922.

Col. Elliott, an official of the Farm & Home Savings & Loan Association was called as a witness by Mort Gaugh, and testified that on April 16, 1912, Mort Gaugh took a certificate in the Association for

$1000, which matured April 20, 1917; that on December 17, 1913, he took another certificate for $1500, which matured on February 20, 1920; on October 30, 1914, a certificate for $2000, which matured February 20, 1921. He also testified that Mort Gaugh on January 16, 1917, took a certificate for $4000, and on January 17, 1917, another certificate for $1000, and that neither of these had matured at the time of the trial. These were presumably the certificates referred to by Mort Gaugh in his financial statement made to the Pioneer Trust Company on June 28, 1922. The witness said the financial standing of Mort Gaugh was good.

We have heretofore referred to testimony as to statements by Judge Gaugh that the Courtney farm belonged to his son Mort Gaugh. The respondents introduced testimony as to certain declarations of Judge Gaugh as tending to show that he was the owner of the Courtney farm. There was also introduced in evidence a blue print made by the county surveyor, in 1919, of a line of roadway at the farm. This blue print, or sketch, seems to have been a paper in the hands of the administrator. It had indorsed upon it the following: ''Sketch of proposed improvements on the farm of Judge Gaugh, Section 24, Township 50, Range 52.'' This, Mort Gaugh said, was a blue print of the road from the gate to the house, and he testified it was made by the county surveyor as a courtesy to his father, but that he himself had marked off the line of proposed improvement and caused it to be done and paid for the improvements. Earl Rankin, husband of Karalee Rankin, testified that Judge Gaugh always spoke in Mort's presence that it was his (Judge Gaugh's) farm. The witness lived in New York City and testified that he had been on a visit in the summer of 1921, and was at the farm, and that Judge Gaugh spoke of it as his farm, and that Mort Gaugh never disputed it. Dean Franklin, brother of respondent Maude Gaugh, testified over the objections of appellants, that he had frequently heard Judge Gaugh speak of this farm as his farm and what he intended to do with it, and that he spoke of getting a road built there; that it was a tremendous expense, but would enhance the value of the farm; that he wanted to get it in such shape that it would be an ideal location for some club.

M. J. Pendergast, city clerk, testified that he was well acquainted with Judge Gaugh and was frequently with him, and had been at the Courtney farm as a guest of Judge Gaugh. He was asked if he ever saw Judge Gaugh give any directions or orders around the farm. He answered: ''Well, I seen he talked to the men down on the farm several times.'' In another place he said: ''I heard him tell men down there what to do. I seen him go down and get the cows and milk them.'' He did not know, however, whether he had ever talked to the judge about the farm in the presence of Mort Gaugh. On his

cross-examination he was shown a number of the checks given by Mort Gaugh to various persons and he identified the names of a number of the payees of the checks as persons whom he knew, and had seen working on the farm. He testified also that he went out to the Lone Jack farm with Judge Gaugh one time. He was asked if he heard Judge Gaugh express any disapproval of the purchase of the Lone Jack farm. He answered that Judge Gaugh said: "I tried to keep that damn Mort from buying that farm, but he insisted on buying it, so I let him have his way and he bought it." Asked about his being occasionally at the place of business of the printing company, he said he was frequently there, and saw Judge Gaugh during the time prior to his election; did not know whether he was active or not. Asked who did the actual work there for years, and at that time, he answered: "I think Walt and Mort were there most of the time." Asked if they were the men that really were running the business he answered: "Well, they were there all the time doing the actual work and taking orders." On his redirect examination he was again asked over appellant's objection to tell what Judge Gaugh said about the Courtney farm, and answered: "He said he bought the Courtney farm because he was sick and wanted to go out there and try and recuperate on the farm." The other witness testifying to statements made by Judge Gaugh, that he owned the Courtney farm, and testifying to statements by Mort Gaugh that his father Judge Gaugh owned the Courtney farm, was respondent Karalee Rankin. Her testimony upon this and other matters covers much space in the record.

Karalee Rankin's testimony in the main related to occurrences during two periods of time when she was in Kansas City. As to the first of these, there is dispute whether she arrived in Kansas City on June 30, or July 2, 1922. The second was for a time beginning September 14, 1922, when she and her husband came to Kansas City immediately after the death of Judge Gaugh. The time when she arrived in Kansas City on the first of these two visits referred to, was a sharply defined issue in the testimony. Her testimony was that she came to Kansas City, and was with her father on June 29, 1922, or June 30, 1922, when he opened his safety deposit box at the Commerce Trust Company, in her presence, at which time, she testified, she saw numerous bonds, certificates and documents, and among them deeds from Mort Gaugh to Judge Gaugh. She fixed June 29, more positively as "the first, last and only time" she was with her father when he opened the box, but on the reopening of the case, said it was June 28, 1922. The safety deposit records of the Commerce Trust Company showed that Judge Gaugh was in his box on June 28, 1922, at 11:47 A. M.; on June 30th, at 9:12 A. M., and on July 3d, at 1:56 P. M. Respondents' claim is that on September 12, 1922

(the day of Judge Gaugh's death), Walter Gaugh went to the safety deposit box kept by Judge Gaugh and Walter Gaugh, in the Commerce Trust Company, and removed various documents, bonds, the Queen City stock certificates, deeds from Mort Gaugh to Judge Gaugh, and other things of value belonging to Judge Gaugh, and that on the same day he took those papers to a safety deposit box kept by himself and Mort Gaugh, in the Missouri Savings Association Bank.

Appellants deny that Walter Gaugh took said papers, and claim that Karalee Rankin fixed the time when she said she was with Judge Gaugh and saw these documents, as of June 28, 1922, or if not then, on June 30th, when in fact she was not in Kansas City on either of those dates, because she knew at the time she testified that the records showed Judge Gaugh had visited his safety deposit box on June 28th and June 30th; and that she did not fix the time as of July 3, because, although she was in Kansas City on July 3, she spent the afternoon of that day in writing letters at the Elks Club, after lunch at the club with her father and brothers. Mort Gaugh testified that she remained at the club that afternoon. It appears that Mort Gaugh lived at the club at that time. The records of the entries of Judge Gaugh on June 28, and June 30, and on July 3, had been introduced in evidence before Karalee Rankin testified, and these and other entries of the safety deposit boxes bore relation to still other circumstances, as will more fully appear.

The testimony showed that Judge Gaugh died between six and seven o'clock on the morning of September 12, 1922, at Excelsior Springs, where he was temporarily stopping with his wife, Maude Gaugh; that Walter Gaugh was advised of his death, and started at once for Excelsior Springs; that in going to the Interurban Railway Station, he left word for Mort Gaugh at the Elks Club. Walter Gaugh reached Excelsior Springs at 9:45 A. M. and Mort Gaugh came on about one hour later. Walter Gaugh returned to Kansas City the same day, arriving at about 12:30. The record kept by the Commerce Trust Company showed entry by Walter Gaugh, of the safety deposit box, kept by Judge Gaugh and Walter Gaugh, at 2:48 P. M. of that day. The record kept by the Missouri Savings Association Bank showed the entry of the box kept in the name of Walter Gaugh and Mort Gaugh at 2:56 P. M. of that day, by some one, but that record did not show by whom the entry was made.

Recurring now to the testimony of Karalee Rankin connected with the occasion, June 29 or June 30 and the safety deposit box of the Commerce Trust Company: On her direct examination, when asked what she saw in that box that day, she said: "I saw a deed from Mort Gaugh back to father, and the reason of that is that father was afraid—". She was then admonished by her attorney not to tell the

reason for that. Her attorney then stated that he knew the reason for the deed—it was the transfer back of the real estate; and she rejoined: "That is the reason he took me to the safe deposit box." Asked if she saw anything else in the box, she answered: "I saw Liberty bonds—I can't say; I think $1000 Liberty bonds—there were fully thirty or forty or maybe fifty. I also saw an envelope there, or book which Walter Gaugh himself had written 'Property of Karalee Gaugh,' with my stock in it, and had a little note in it. Father told me the note was not worth a nickle because it had no stamps." After some questions as to the kind of box she saw there, she said: "Wait just a moment, I forgot to tell you something else that was in there Mr. Wise—those stock certificates, that the boys got afterwards, those were in there, those Queen City stock certificates." In cross-examination she was asked if she looked at the box and the contents of the box, and if she saw a deed from Mort Gaugh to his father. She answered: "I did not see a deed. I saw several. Quite a few. I did not count them." Asked if she saw the deed and how much she read, she said: "How did I read the deed? I read the deed was from Mort to my father because father explained to me what it was." Then follows, on cross-examination:

"Q. I want you to confine it to one thing at a time. How much of that deed did you read? A. I read on there 'from G. Mortimer Gaugh' outside. On the top was a 'warranty deed' and it was a deed from G. Mortimer Gaugh to Dad.

"Q. Yes, how many? A. There were at least three or four and probably five or six, I don't remember that.

"Q. When you looked at the body of the instrument you saw what was the description of the land? A. Why, certainly not. Dad just picked those up. He says: 'I want you to see these things,' and he picked them up for me to see them. He took those Liberty bonds, fanned them out like that, and I saw quite a number of those."

There is weighty testimony that Karalee Rankin did not leave New York City until the night of June 30, 1922, and reached Kansas City on July 2, 1922. It tends to show that she came to Kansas City at that time for two purposes. The one was to obtain some money, and the other was for treatment for an illness by Dr. Kanoky of Kansas City. Mrs. Knox, Karalee's mother, was living with her in New York at that time, and testified that Mrs. Rankin suddenly decided on June 29th, to go to Kansas City, after an examination by a physician in New York, and that she left for Kansas City on the evening of June 30th. Mort Gaugh testified that she arrived in Kansas City on Sunday morning, July 2d, and that he met her at the station and took her to Walter Gaugh's house. Mrs. Burnett, who lived at the home of Walter Gaugh, testified that Mrs. Rankin came to Walter Gaugh's home on Sunday before the 4th of July, 1922.

Dr. Kanoky testified that his record showed the first visit of Karalee Rankin to him was on July 5, 1922. Walter Gaugh testified that Mrs. Rankin arrived in Kansas City on July 2d. When Mrs. Rankin left New York City she took with her a certificate for five hundred and eighty-three and one-half shares of stock of the Kansas City Flour Mills Company, owned by her husband, Earl Rankin. This certificate was indorsed, in blank, by Earl Rankin, and his signature witnessed by Karalee Rankin. The date of the indorsement, filled in by Mr. Rankin, was June 30, 1922. Earl Rankin explained this date of June 30th when testifying after the case had been reopened, by saying that he wrote in the date because he thought she would arrive in Kansas City on June 30th, and filled in that date, as a precaution, in the event the certificate should be lost or stolen before she arrived in Kansas City. The testimony shows that Earl Rankin and Karalee Rankin at this time were in straits for money. After her arrival in Kansas City she first applied to a Mr. Moses, of the Flour Mills Company, with the view to selling the stock or procuring a loan. She did this on July 3, 1922. Earl Rankin, upon the second hearing, testified he had investigated and learned that she had seen Moses on July 3d. She failed to secure any money upon the stock in that way, and her father agreed to let her have $2500. He arranged for doing so on July 3, 1922. The record of the Commerce Trust Company and testimony of its officer, showed that on July 3, 1922, Judge Gaugh sold to the Trust Company $2500 of Liberty bonds, kept in his safety deposit box. His account with the Trust Company shows the placing of the $2500 to meet a draft to be drawn by Earl Rankin and a credit also of $30.25, the interest on the bonds. On that day, he caused a telegram to be sent to Earl Rankin, authorizing him to draw for $2500. This draft was drawn by Earl Rankin, and was paid on July 8th. This accords with the entry on the records of the Trust Company, also showing that Judge Gaugh was in his safety deposit box on July 3d, at 1:56 in the afternoon. The record of the Commerce Trust Company and the testimony of its officer, also showed that on June 30, 1922, Judge Gaugh had sold to the Commerce Trust Company $4000 of Liberty bonds; that for these, principal and interest he received a treasurer's check for $4000, which he deposited with the Continental National Bank, and was given credit with the Commerce Trust Company for $38.40, the interest. The testimony does not make clear what was done with the $4000.

Karalee Rankin left with her father the certificate for the Flour Mills stock. The testimony of Mort Gaugh and of Mrs. Knox shows that Karalee Rankin desired her father to raise an additional $2500 for her, which he apparently was unable to do during her stay in Kansas City at that time  There was introduced in evidence a receipt, dated August 29, 1922, given by Judge Gaugh to Karalee Rankin, for

the certificate of Flour Mills stock, stating it was to be kept in his deposit box for safe-keeping, and returned in case of his death. This receipt was witnessed by Karalee Rankin, and below was a statement signed by her that, in the event of her death, the certificate was to be delivered to Earl Rankin. On cross-examination, she said she left this stock because there was a railroad strike on and she did not know whether she would get home. She left Kansas City on August 31st, and returned to New York City. Mort Gaugh testified that before she left Kansas City, she asked him to get her the additional $2500 and he promised to do so. That this is true, is confirmed by a letter written by Karalee Rankin after her return to New York mailed at New York on September 5th, the envelope directed to Mort Gaugh, in which she wrote: "I hope that you and Dad can scrape up some more money. Otherwise, I don't know what I am going to do . . . So get hold of Daddy and write me or wire so I will know what to do." At another place she wrote in this letter: "Mother says we can borrow on her house." Mrs. Knox testified that after Karalee's arrival in New York from this visit, she said with reference to the additional $2500 desired: "Dad could not raise her any more money at that time, but that they were going to try to raise her some more. Mort would raise her some more, perhaps." The record shows that Karalee Rankin during this time had up with her mother, Mrs. Knox, the question of securing the additional $2500 by a mortgage to be executed by Mrs. Knox upon a property in Kansas City owned by Mrs. Knox, who wrote to Karalee, under date of August 28, 1922, expressing her willingness to mortgage her property to help her daughter out.

Mort Gaugh testified that his father gave him the Flour Mills certificate for the purpose of borrowing $5000, the amount desired by the Rankins, and that on September 11th, he succeeded in arranging to procure a loan, and accordingly on that day, sent a telegram to Karalee Rankin. That telegram was received by her, and she told her mother on receipt of it, that she would not give any note for $5000. The telegram announcing Judge Gaugh's death went the next day.

The contention of appellants was that the Flour Mills stock was left as collateral security and evidently, that the $2500 loan by Judge Gaugh was to be taken up. Karalee Rankin insisted that it was not; that the $2500 was not borrowed from her father, but that he gave it to her, and that she only left the certificate with him for safe-keeping. Earl Rankin admitted drawing the $2500 draft, and its payment, but denied that he ever borrowed any money from Judge Gaugh. Karalee Rankin testified she bought an automobile with the money. The transaction and dispute about the Flour Mills certificate of stock formed the subject of a replevin suit, pending between the

parties, as is shown by the record. Its ownership is not in issue here, but these circumstances are mentioned in connection with the other circumstances—the visit of Karalee Rankin in July, and the sales of Liberty bonds by Judge Gaugh on June 30th and July 3d, and in connection with the statement of Karalee Rankin that she saw in the safety deposit box thirty, forty, maybe fifty $1000 Liberty bonds, and with her statement that her father could not raise more than $2500 for her, and her application to Mort Gaugh to try to raise the additional money for her. The circumstances surrounding this transaction also are to be considered in the connection with the Federal Income Tax return of Judge Gaugh for 1921, and the financial statement made by Judge Gaugh on the 28th of June, 1922, to the Pioneer Trust Company, wherein he gave the amount of Liberty bonds owned by him as being $5000.

Although the receipt given by Judge Gaugh to Karalee Rankin was dated August 29, 1922, she insisted that the certificate for the Flour Mills stock was given to him on June 29, 1922, the very day and time, she said, when she was with him looking at his safety deposit box, and she said he put it in the box on that day and on that occasion.

As showing the character of the testimony of Karalee Rankin concerning statements of Judge Gaugh we set out portions of it:

"Q. During your father's life with Walter and Mort together, did you four ever have any discussion in reference to your father's property? A. You mean father and Mort and Walter and I?

"Q. Yes. A. We certainly did. He would frequently say that the dream of his life, if he ever should die, was to leave his children independent for life, all of them.

"Q. Did he enumerate his properties? A. Yes, sir, he did so, frequently; in fact, about this place that Mort claims he owns, I went back to New York and those Benton Boulevard premises were to be sold out there, and I was to have $5000 on the first of October on that.

"MR. HACKNEY: I don't think she stated whether that was in the presence of Mort and Walter. A. Yes, that was in the presence of Mort and Walter, Mr. Hackney.

"Q. Did you ever discuss with the three of them the title and ownership of the Courtney farm? A. Absolutely. •

"Q. What was said? A. It was said that father was obliged to buy this farm out here because it increased his life fifteen years; they said that when he went out there he was a broken down man, and that summer I was here his cheeks were just as red and he was healthier than I am this minute.

"Q. Was anything said about the record title and the real ownership of it? A. He said very frequently it was a known fact that he

would put things in Mort's name for convenience because Mrs. Gaugh would not sign deeds. Now, wait just a moment—

"Q. What was said in reference to the Courtney farm? A. Yes, sir, this whole thing was said in reference to it one night down there in front of a wood fireplace, you see, down there, and dad and the little Taylor boy and myself, and we all spoke about it, and it was even spoken of that night if I would come on down and live there they would build me a house down there. I says, 'You don't get me out here, there are too many chiggers.'

"Q. What was said and who said it? A. What was said about what?

"Q. Who owned the property? A. Why, Mort admitted that father owned the property, there wasn't any question, Mort would tell father didn't he think this would be a good idea to do thus and so, and father would say 'No, you don't know anything about anything, keep still.'

"Q. What did Judge Gaugh say about the farm? A. He said he bought it.

"Q. Did Mort dispute it? A. Absolutely not, he said he bought it very cheap too, and he said he was going to make a golf club, and later Mr. Ferd Heim and father sat down here at the Elks Club and laid out a plan whereby—"

Again we set out more of her testimony, in which she apparently refers to conversations had both before and after her father's death, and refers to the stock in the Queen City Company.

"Q. Now, did you have any talk with them about the Queen City Building & Investment Company? A. I had a talk with them and father for years about it, ever since 1917, talked with father and talked with them, and talked with them in the presence of father, and father in the presence of them.

"Q. We are speaking after your father's death? A. Many a time, absolutely, of course.

"Q. What was said? A. There was no question but what it was going to be share and share alike, the question was this, that father owned every bit of that stock except one share which was in the name of each of us, it was father's company, they knew the same as I did, of course.

"MR. HACKNEY: I object to her statement as a conclusion.

"THE COURT: Sustained.

"Q. Is that what they stated to you? A. Absolutely that it what they stated to me.

"Q. Did they ever state to you that they did own the stock of that company? A. Quite to the contrary. Mort said that he knew that he didn't have any interest in anything, because formerly he had told

Earl that he borrowed the $2500 on this receipt—I forgot to put that in—and so when I said—

"By Mr. Hackney: Q. Was that in the presence of Mr. Rankin? A. Yes, that was in the presence of Mr. Rankin, I beg your pardon, Mr. Hackney.

"Q. It was in your presence that that discussion between Earl and Mort had come up? A. That was in the car going out to Walter's house before father was buried when Mort said, when we said we had a receipt for that, Mort said, 'Well, I borrowed that money,' I was right with my father when he went and got bonds and sold them, that was in the safe deposit box.

"Q. Now, did you discuss with Mortimer the matter of the Courtney farm? A. We not only discussed it once or twice or twenty times or fifty times, but we discussed it every day of the world.

"Q. What did he say about it? A. He said that the farm belonged to father, of course there was no necessity even to say that, all of us knew it, everybody knows it in town.

"Mr. Hackney: I object to that and ask that it be stricken out.

"The Court: Sustained.

"Mr. Wise: I beg your pardon, she has stated what he said to her.

"The Court: No, what everybody knew.

"A. That is what I said, he said that everybody knew it, that they could not get away with that, that is the reason they were going to say they made all this money that bought that farm out there, that was the idea of it.

"Q. Is that what he said to you? A. Absolutely.

"Q. When you stated to him that everybody knew it, did he deny that? A. I didn't say to him, he stated to me that everybody knew it, that was the reason they were going to threaten them off and on.

"Q. Did you have any talk with them about the business or ownership of it? A. Absolutely, they gave me $500 out of the business, they charged everything I ever got, and it was paid with Union Printing checks and we wondered and asked Walter in our brother's house, he said, 'Father paid the bills.'

"Q. I am asking after your father's death? A. That is what I am telling you, there never was any question the business belonged to father, never was a question in the world about it, they never denied it."

The receipt referred to in the testimony was the one for the Flour Mills certificate.

In one part of the testimony of Karalee Rankin as shown by the record, she places herself as present when Judge Gaugh sold the $4000 worth of Liberty bonds to the Commerce Trust Company. She does this in undertaking to state what she told the officials of the Commerce Trust Company after her father's death. As she relates

it, she went to the window to ask if her brother was claiming every penny that her father ever made. She quotes herself as saying to the Trust Company official: "I stood right here at the window with Dad when he cashed in $4000 worth of Liberty bonds." After a few questions and answers the following appears: "Q. You arranged that day to have the draft drawn? A. No, that was in the morning about eleven o'clock. From there I went down to the Elks Club with Mort and Walter and Dad, and then Dad had Walter write out this telegram and send it to Earl to draw on him for $2500, and he did."

The circumstances under which Walter and Mort Gaugh acquired title to the Admiral Boulevard property should be noticed. This is the property which was conveyed by them to the Queen City Company. Walter Gaugh testified that he bought the property known as 408-410 Admiral Boulevard in October, 1909, from Mr. McTiernan and received the deed for it. This deed was put in evidence. He testified that in this purchase he dealt with McTiernan himself, and McTiernan's testimony does not tend to show that Judge Gaugh took part in the negotiations. Walter Gaugh sold one-half interest in this property to Fratcher, and thereafter a building was erected upon the property. Fratcher was also engaged in a printing business carried on in this property and it appears Judge Gaugh had some interest in the Fratcher printing business.

Walter Gaugh's testimony is that his father gave him the money to buy the lot. He said that he had gone to work in the printing business to learn it when he was fourteen years old, and remained with it continuously thereafter. He said he had done some individual jobs in which he had earned some money, and mentioned one, for which he said he had a profit of $2500. He testified, however, that in the erection of the building at 408-410 Admiral Boulevard by himself and Fratcher, Judge Gaugh watched the construction work, and paid the contractor. He asserted that he bought the property and held it as his own until he conveyed it to the Queen City Company.

Mort Gaugh testified that he bought the property at 404-406 Admiral Boulevard, and received a deed thereto in 1912; that the cash payment made at the time of the purchase was by his check for $2250 on the Missouri Savings Association Bank. The canceled check to McTiernan was introduced. He further testified that for the other part of the purchase price he made a loan on the property, and made a succession of deeds of trust to secure loans, until the rents paid the loan. The several deeds of trust showing those transactions were introduced.

The transactions involving the issuance of certificates of stock in the Queen City Company are to be noticed. The evidence is un-

disputed that the Queen City Company at the time its charter was acquired, had no assets, and it was acquired to be used as a holding company for the property referred to. Witness Harry Longnecker said he procured this charter at the request of Judge Gaugh and his sons. It appears that prior to the time this charter was acquired, certificates had been issued up to and including No. 40, by the former owners of the charter. The parties herein, in issuing certificates, began with certificate No. 41. The evidence shows issuance of certificates of stock in the Queen City Company under three dates, May 24, 1917, June 11, 1917, and September 19, 1922. The evidence shows that on May 24, 1917, there were issued certificates as follows: No. 41 to Judge Gaugh for seventy-seven shares; 42 to Mort Gaugh and 43 to Walter Gaugh, for one share each, and 44 to Karalee Rankin for one share. On June 11, 1917, there were issued to Judge Gaugh certificates 45 and 46, each for thirty-eight and one-half shares, in place of the seventy-seven shares, issued on May 17th. On September 19, 1922, certificate 47 for thirty-eight and one-half shares was issued to Mort Gaugh and 48 for thirty-eight and one-half shares was issued to Walter Gaugh, and 49 for one share was issued to Mort Gaugh, and 50 for one share was issued to Walter Gaugh. The administrator asked cancellation of those reissues. The transaction or meeting on September 19th, after the death of Judge Gaugh, was one in which, besides Mort and Walter Gaugh, Earl Rankin was present. All of these various certificates were introduced in evidence. Certificates 45 and 46 were indorsed by Judge Gaugh. It is conceded that the signature ''George G. Gaugh'' on the back of each of these is the genuine signature of Judge Gaugh. The only other writing on the back of these is the name of the transferee. The transfer blank on the back of No. 45 showed the name George M. Gaugh as the transferee, and No. 46 has the name of Walter Gaugh written as the transferee. Respondents claim the names of the transferees were written in after Judge Gaugh's death. Earl Rankin testified that at the meeting on September 19, 1922, he saw these certificates Nos. 42, 43, 45 and 46, and said that the names, George M. Gaugh in the indorsement of No. 45, and Walter W. Gaugh on 46, had a newly written appearance, and different appearing ink, than other manuscript of such certificates. Appellants have transmitted the original certificates Nos. 45 and 46, for comparison of the concededly genuine signature of Judge Gaugh to the transfers with the signature on the bill of sale to the chattel property belonging to the printing business, which, the respondents say, is a forgery. Having them here, we have examined them. However, lapse of time make it impractical now to say one is fresher writing than the other. If there is a difference in color of ink it is slight, and we express no opinion on that question.

Harry E. Longnecker testified that he was present in an advisory capacity, as attorney, in the transaction of May and June, and also in September. The testimony was that the respective names of the transferees in certificates Nos. 45 and 46, were in his handwriting. Longnecker testified the certificates were delivered to Mort or Walter Gaugh; that they were all there together at the time; that the question of stamps was not raised. The indorsement was not dated nor witnessed, but Mr. Longnecker said the certificates were issued and indorsed on June 11, 1917, and that this was done at the time of the delivery of the deed by Walter Gaugh and Mort Gaugh conveying the Admiral Boulevard property to the Queen City Company. He thought he wrote the names of the transferees with a fountain pen. Certificates 45 and 46 are marked across the face "canceled." This cancellation was made September 19, 1922, when certificates Nos. 47 and 48 were issued to appellants.

We return, to notice certificate 42 for one share to Mort Gaugh and certificate 43 to Walter Gaugh, issued June 11, 1917. Each of these was indorsed to George G. (Judge) Gaugh. As introduced in evidence, as the record shows, the indorsement on each carried revenue stamps, and that these revenue stamps were marked as cancelled "6-11-17." A witness introduced by respondents was shown certificates Nos. 45 and 46 bearing revenue stamps cancelled, with notation, "6-11-17." The witness said the stamps were of the issue of 1918. When and by whom the notation was made on the stamps is not made clear by the evidence. Mr. Longnecker testified that the two certificates, Nos. 42 and 43 for one share each, issued respectively to Mort Gaugh and Walter Gaugh, and indorsed by them respectively to Judge Gaugh, were done for the reason it was necessary for Judge Gaugh to have shares of stock for corporate purposes, and to qualify him for president of the company, and in order that there might be three resident owners of stock. These two certificates, 42 and 43, also bore the notation "canceled." They were succeeded by certificates 49 and 50 for one share each, issued to Mort and Walter Gaugh on September 19, 1922. The certificate No. 44 to Karalee Rankin remained untransferred. Mr. Longnecker in his testimony justified and explained the cancellation of certificates 42 and 43 on September 19, 1922, and issuance of certificates Nos. 49 and 50 in lieu thereof, by saying that Judge Gaugh was not the actual owner of certificates Nos. 42 and 43, or of any shares, but only held those shares in trust and to qualify him for president of the company. His statement that Judge Gaugh was not the owner was stricken out. The validity of these cancellations is disputed by respondents, but it is not claimed that the indorsements in blank on Nos. 45 and 46 are not the genuine signatures of Judge Gaugh. The only signature which respondents claim is a forgery is the signature to Exhibit 14,

the bill of sale to chattel property along with the printing and binding business. That exhibit has been sent here, together with many exhibits containing concededly genuine signatures of Judge Gaugh, including the Queen City certificates Nos. 45 and 46. Two witnesses pronounced the signature to the bill of sale, false. Numerous others, including bank officials who had known Judge Gaugh and paid money on his checks, said the signature to the bill of sale was genuine. A large number of witnesses, apparently disinterested, testified to statements of Judge Gaugh made about the time or after December 8, 1918, the date of the bill of sale, that Judge Gaugh said he had turned the printing and binding business over to his sons. To some of them he said that the boys had built up the business, and he had turned it over to them. It would seem that after his election as county judge, he took frequent occasion to make statements to that effect. The Printing & Binding Company furnished record books and supplies to county and city officials. Mr. Longnecker, who prepared the bill of sale at Judge Gaugh's request, testified that he said that he had made it, and that he inquired whether it was necessary for it to be acknowledged and recorded. The record entry of the finding of the trial court makes no finding that the signature is a forgery. It is urged, however, that the oral statement of the court taken down by the stenographer, not made a part of the record, but printed in the briefs for respondent, should be given consideration; that it contains the statement that in the opinion of the chancellor the signature to the bill of sale was a forgery. From our inspection, we are not prepared to say it is a forgery. In any event, and even if the trial court was of the opinion the signature was a forgery, the finding was nevertheless in favor of the appellants as to the very property described in the bill of sale, and respondents did not appeal from that finding. With that we dismiss that question, merely stating that we cannot say from our inspection that the signature is a forgery.

The testimony as to occurrences after Karalee Rankin arrived in Kansas City after the death of her father, requires notice. She testified that she and her husband were met at the station by Walter Gaugh and Mort Gaugh; that she and her husband rode in the car driven by Mort Gaugh to Walter Gaugh's house; that immediately after they started to drive from the station Mort Gaugh said to Earl Rankin: "Well, we got away with everything, we went south with everything, we even got your stock, we have got your note for $2500;" that Earl Rankin replied he had given no note, and that she, witness, stated that she had a receipt for the stock; that she handed it to Mort and he read it, in another part of her examination saying, he had driven with one hand, holding the receipt with the other; that upon reading the receipt Mort Gaugh said: "Oh, for heaven's

sake don't tell anybody about that. You will get us all in bad." Further, in substance, the testimony of the witness is that their representations to her, while in Kansas City upon this occasion, were that they got everything from the safety deposit box that would be of value to the widow; that the widow would have to take what they would give her; that then, what property there was, could be divided between the three of them. It may be noted that, although Earl and Karalee Rankin both testified they were told that everything had been taken, including the receipt of the Flour Mills stock, they did not inquire what else had been taken. They made no inquiry about bonds. On the trial, Karalee Rankin, pressed to explain why she had made no inquiry at the time, as to how many bonds Walter Gaugh had taken, refused to answer the question further than to say that she did not suppose her brothers were thieves. Earl Rankin explained his reason for not asking what had been taken by saying that he had no authority to act or speak for his wife.

Karalee Rankin remained in Kansas City on this occasion for about a month, and according to her testimony, her brothers continually persisted in talking about the property—what they had done with it and what the widow should have. She testified that they said: "We have just to get rid of this thing, she is coming in here and claiming everything, and the minute we can get her settled and out of the way, then we will divide things the way they should be and the way Dad wanted it." The witness then added: "Wait a minute—they said father said to drive this woman out of this town. Mort said and Walter said it, both."

Mrs. Rankin often mingles together in confused statements, transactions and conversations unrelated in time or subject-matter. Her mother, Mrs. Knox, testified that Mrs. Rankin at the time was in such condition that she was not responsible for her acts.

There is much testimony that Karalee Rankin, during the period following her father's death, while in Kansas City, demanded of her brothers that she have one-third of the property, that is, evidently, the property in dispute in these suits, and presumably, what there should be after a settlement with the widow, Maude Gaugh; and that she demanded that an agreement for such division be made in writing; but, that Walter Gaugh and Mort Gaugh said they would not give up what they had worked for. Also, Mr. Longnecker testified that upon the occasion when the foregoing was the subject of conversation between them, he explained to Mrs. Rankin that even if she was entitled to such a division of the property under such an agreement, it could not be done, because, if they made such an agreement, the widow would have evidence to come in on equal terms.

Out of the testimony about these discussions the fact appears that Karalee Rankin told Maude Gaugh nothing of any disclosures made

to her by her brothers; but, that when she was told by Walter and Mort Gaugh they would not sign an agreement, and would not give up what they worked for, she threatened to turn over to the side of the widow. Earl Rankin testified that he forbade his wife having anything to do with the plan of settlement by the two brothers with Maude Gaugh. He said Walter and Mort Gaugh told him "they could give the widow $50,000 and still be ahead of the game." However, he was present at the meeting on September 19, 1922, of the Queen City Company, when the shares of stock were reissued, as has been heretofore stated; and he made no real remonstrance against what was then done, his explanation being that he had no authority to act for his wife. He witnessed the indorsement by Walter Gaugh and Mort Gaugh of the new certificates then issued. He signed the minutes of that meeting. As introduced in evidence, it appeared that he signed as proxy for Karalee Rankin, but he testified that the words "proxy for Karalee Rankin" were not part of the minutes when he signed.

There is much testimony about the custody of these certificates of the Queen City Company, and where they were kept. Mort Gaugh testified that he kept the certificates; that when the certificates were issued in June, 1917, they were not delivered to his father, but that certificates Nos. 45 and 46 were delivered to him at the time his father indorsed them, and that he kept these certificates in the box at the Missouri Savings Association Bank, "most of the time; that the certificates would be brought out for a meeting. He was asked when he got them out of the safety deposit vault after his father's death. His answer was: "The day, that is the night, I got it either two or three days before, I had it temporarily, I went to my room and got the stock, and brought it up to the office." He said that he got it out of the box some time after his father's death, but was not clear as to the time, and said he was not at the Missouri Savings Bank on the day of his father's death. He said that he came back from Excelsior Springs' on the day of his father's death late in the evening, between five and six o'clock.

Walter Gaugh did not tell plaintiff, Maude Gaugh, that he went in the safety deposit box in the Commerce Trust Company. He did not tell the Trust Company officer his father had died. He testified that all he took from that box was some letters and a life insurance policy belonging to a former wife, and said he took these because he did not want them to fall in the hands of other people. The record showed that he had entered the box in the Commerce Trust Company in June, 1919, but not afterward before the day of the death of his father, a period of more than three years.

In an examination before a commissioner appointed to take depositions before the trial of the cause, Walter Gaugh testified that the

certificates were in his possession as treasurer and secretary; that he kept most of his father's papers; that they were kept in the safe at the office; that the certificates were all kept together. In a deposition (a second one, it seems) he had testified the certificates, at the time of his father's death, were in Mort's safety box. In a deposition he had also testified he had taken nothing from the safety deposit box. We infer from statements in the briefs and also from what appears in the record that depositions of Walter Gaugh and Mort Gaugh were taken on two occasions, but if so, we cannot always definitely say which occasion was referred to in their examination in the course of that trial. When the box was afterward opened the only papers found belonging to Judge Gaugh of any value, were some certificates of stock of the Midland Life Insurance Company, and a fire insurance policy.

It appears from the testimony that when Maude Gaugh qualified as administratrix, she was accompanied by Mr. J. G. L. Harvey, who died afterward, and they looked at the papers of Judge Gaugh at the office at Admiral Boulevard, and also in the safety deposit box. They found the shares of stock in the Midland Life Insurance Company, and a fire insurance policy, and little else.

Earl Rankin testified that on the same day after this examination had been made, he was at the office at Admiral Boulevard and Walter and Mort Gaugh were there; and that Mort Gaugh then referred to the fact that Harvey said there was nothing of value left in the office, and that Mort Gaugh then said: "Well, I spent most of the night here last night, and I burned up every scrap of paper in this office that will help establish any claim in this property other than that standing in Judge Gaugh's name;" that he also said, the widow would have to take what they saw fit to give her, or else she would get nothing. Earl Rankin testified in one place, that he did not protest against the action of Walter and Mort Gaugh; that he "was not concerned in it;" had "nothing to do with it," but afterwards said he told them he would not consent to any plan or arrangement made with Mrs. Gaugh, if Mrs. Rankin was involved. He also testified that in the discussion at this time, Walter and Mort Gaugh told him that they had no interest in the Queen City Company; that all the property which went into the company belonged to their father. In the same connection, and immediately thereafter, he testified he told them if they would show "where they ever saved a dollar in their life time," he was willing to talk with Mrs. Rankin and get her to equalize the equity they held in the property; and that to that statement they replied they had no interest in it, and their sister was entitled to an equal share with them, and they would give it to her; that he told them he would not permit Mrs. Rankin to take part in plans to defeat the widow; but if they intended to take charge

of the properties to defeat the widow, they ought to give Mrs. Rankin a writing that she would receive an equal share with them. And he also testified that he went to the office of Longnecker who, he said, was supposed to represent all three of them, and there, he said, Longnecker told him that he knew Mrs. Rankin was entitled to an equal share, but that he did not want the widow to find out that such an agreement was in existence, as it would aid her in defeating the boys, and getting more property than they thought she was entitled to.

The testimony of Maude Gaugh as to the settlement with Mort Gaugh made on December 28, 1922, is to be noticed. Her conveyance to him was of all her interest in the real estate, wherever situate, and in all other property. It was shown that she had a check for $1000 which Judge Gaugh had given her, but which had not been cashed, and that there had been an allowance to her as widow of $1800, and these two items were included in the total sum of $12,900 paid her by Mort Gaugh. She testified that she was not told that Earl Rankin owed the estate $2500; nor, that he also owed the estate a note for $500. As to this $500, Karalee Rankin had testified that Earl gave her his note for $500, which she gave to her father. Concerning this note and a conversation with her father, she testified: "Dad asked then this last time, 'What do you want me to do with this note? It is not worth a cent—no consideration in it. You want us to charge it up?' I says: 'Dad, put it in an envelope with my stock and with my other things in the safety deposit box. It is perfectly all right.' "

On the first hearing, before Maude Gaugh filed her second amended bill, she testified, on direct examination, that at the time she made the settlement with Mort Gaugh she was not "informed that Judge Gaugh had an interest in the Queen City Company" and "was not informed that he owned the Courtney farm." As heretofore shown, she had brought the suits, one as widow and the other as administratrix, more than two months before this settlement was made, and depositions of Walter and Mort Gaugh and of Henry Fratcher and others had been taken. As widow, before filing and election, she had brought a suit in partition. She testified that she had seen copies of these depositions and read some of them. Also, her brother, Dean Franklin, was staying with her during this period, and until after the settlement with Mort Gaugh. Mr. Franklin lived in Oklahoma and was a lawyer. He said he read the depositions. Although, in the suits filed by her, she had claimed that the property held by the Queen City Company and the personal property standing in the name of Mort Gaugh, was the property of Judge Gaugh, she disclaimed having instructed her lawyers as to bringing the suits or taking the depositions. In the first petition in this suit the real estate in dispute was claimed as the property of Judge Gaugh. In the

suit brought by her as administratrix it was alleged that Walter Gaugh and Mort Gaugh had legal title to the Queen City stock, but had it in trust.

The suits were originally brought by the firm of Harding, Murphy, Stinson and Tucker, and she said she consulted sometimes with Mr. Harding and sometimes with Mr. Tucker. The settlement was finally consummated at the office of Mr. Tucker. Her brother, Dean Franklin, was present. It appears also that Maude Gaugh's deposition had been taken by Karalee Rankin in April, 1923. Parts of this deposition were read upon the trial, over objection of appellants. In that deposition she had stated that her husband told her that property bought that was mortgaged, had to be put in the name of the single son, and as Walter Gaugh was married, he put it in Mort's name; that as to the Queen City property, she knew he said he put his property in that corporation. In that deposition also she had stated that Henry Fratcher told her the boys "rifled the safe" the next morning after their father's death. It is not absolutely clear from this record whether she claimed that what Fratcher told her about the rifling of the safe was said to her before the settlement made with Mort Gaugh; but it seems reasonably clear that she placed this statement of Fratcher's at a very short time after Judge Gaugh's death, because, she connects it with the statement that she had wanted Fratcher to administer, but that he said after he saw how things were, he was unwilling to administer the estate. Connected with that same conversation she quoted Fratcher as telling her that he was surprised to know that the Courtney farm was in Mort Gaugh's name. Fratcher had testified and denied that he told Maude Gaugh that Walter Gaugh and Mort Gaugh had rifled the safe.

No books of account were produced on the trial—no account kept by the printing and binding company, or the Queen City Company, or book account of transactions between Judge Gaugh and his sons or either of them upon any of the multitude of transactions referred to in the evidence. There was a safe at the office, and some testimony tending to show there was a large ledger in which accounts were kept.

There was testimony to show the values of the various pieces of real estate which have been referred to—those in the name of Judge Gaugh, at the time of his death, those to which the Queen City Company held title, and those to which Mort Gaugh held title. The aggregate value of the real estate in the name of Judge Gaugh was $33,450, less an encumbrance of $5,500. The value of the property at 404-406 Admiral Boulevard was shown to be $53,250. The undivided half interest in the property at 408-410 Admiral Boulevard was $20,000, and the undivided half interest in the property at North Corder Place was $20,000; or, a total value of $93,250 of property to which title was in the Queen City Company. The Ninth Street

property standing in the name of Mort Gaugh, and left with him by the decree of the court, was $50,000, less an encumbrance of $22,500, and the Courtney farm was valued at $20,000, a total of $47,500 standing in the name of Mort Gaugh. The property owned by the Union Printing & Binding Company, left with defendants Walter Gaugh and Mort Gaugh by·the decree of the court, was valued, by them, at $2000.

Aside from the sweeping oral declarations there is, in all the numerous and large transactions of Judge Gaugh and his sons, with other persons, and as between themselves, virtually nothing to show their interests other than the documents we have referred to, and what was found upon the stubs of cancelled checks, or statements of account of the various banks mentioned. Judge Gaugh had kept an individual account with two or three banks or trust companies. The character of those accounts was not extensively shown. At the time of his death, he had to his credit with one trust company $92 and with another about $2200.

In this suit the first assignment of error is that of admission of the testimony of Dean Franklin and M. J. Pendergast as to declarations of Judge Gaugh that he had bought the Courtney farm and it was his farm. Assignments two, three, four and five amount to a single contention that the court erred under the evidence in adjudging that Mort Gaugh was not the owner of the Courtney farm. Assignment six is, that the evidence did not justify cancellation of the deed from Maude Gaugh to Mort Gaugh, and assignment seven is a contention that, in any event, the decree is inequitable in not requiring Maude Gaugh to first restore to appellant Mort Gaugh the $12,900 paid by him to her.

I. Appellants complain of the admission of the testimony of Dean Franklin, and Mr. Pendergast to declarations by Judge Gaugh that the Courtney farm was his farm. The evidence does not show that these declarations were made in the presence of Mort Gaugh, but it appears they were statements made in ordinary and casual conversations. Mort Gaugh had the legal title to the farm under the warranty deed made to him, and the presumption of his legal possession of it followed. If Judge Gaugh had been in possession of the farm, these declarations would have characterized his possession and have been competent, if the case were one in which the Statute of Limitations and adverse possession were invoked. But, under the circumstances shown, the declarations as testified to by these witnesses was not evidence of title (paper or equitable). [Swope v. Ward, 185 Mo. 316; Farmers' Bank v. Barbee, 198 Mo. 465; Coulson v. La Plant, 196 S. W. 1144.]

II. The next and chief contention of appellants is that the evidence did not establish a resulting trust as to the Courtney farm. It is the settled rule in this State that to establish a resulting trust, the evidence thereto must be clear and convincing, or, as it is sometimes said, unequivocal, and such as to leave no room for reasonable doubt, and it must be clearly shown that the funds of the person in whose favor the trust is sought to be established went into the purchase of the property. [Forrester v. Moore, 77 Mo. 651; Burdett v. May, 100 Mo. 13; King v. Isley, 116 Mo. 155; Curd v. Brown, 148 Mo. 82; Pitts v. Weakley, 155 Mo. 109; Smith v. Smith, 201 Mo. 533; Jacks v. Link, 291 Mo. 282.]

The Courtney farm was bought after Judge Gaugh had turned over the property and business of the Printing & Binding Company to his sons. The payment of one-third of the purchase price, made before and upon the delivery of the deed, was by checks of the Printing & Binding Company, and the evidence tends to show and the trial court found that Judge Gaugh's sons then constituted that company. There was no effort made on the part of respondents to show that Judge Gaugh in any direct way, by withdrawal of funds from any bank in which he might have had a deposit, had anything to do with the payment of the purchase price of the farm.

There is another rule, applicable in cases of this character, that a resulting trust must arise, if at all, at the time the deed is taken, and· from the facts as they existed at the time or anterior to the purchase, and that such a trust cannot be created by subsequent occurrences. [Kelly v. Johnson, 28 Mo. 249; Richardson v. Champion, 143 Mo. 544; Stevenson v. Haynes, 220 Mo. 199; Bender v. Bender, 281 Mo. 473.]

There was testimony of positive declarations by Judge Gaugh that Mort· Gaugh owned the Courtney farm, and these declarations were made under circumstances when its ownership—the right to give ground for a driveway, and the right to lease the farm—were under consideration; and they were made in the presence of Mort Gaugh, and no interest in the result of this suit is apparent in the witness who testified to those declarations. Judge Gaugh's memorandum or notation, in his own handwriting upon the envelope containing the title guaranty to the farm, is of some significance. In listing the property owned by him, to the Pioneer Trust Company, he made no mention of this farm, although, in that statement he did mention the property standing in the name of his wife; and he must have known that Mort Gaugh, in the statement made by him at the same time, and for the purpose of securing credit, was listing the Courtney farm as his own.

Our conclusion under all this evidence, is that respondents failed to show clearly and unequivocally that the funds which paid for the

Courtney farm were the funds of Judge Gaugh. We are not strongly impressed with the statement of Mrs. Rankin that she saw three, four, five or six deeds from Mort Gaugh to her father, at the time he entered the safety deposit box. Respondents, in their claim to an interest in this farm, base their right upon the contention that there was a resulting trust, and not on the claim that Mort Gaugh had executed and delivered to his father a deed to the farm, or that he had executed in writing his acknowledgment or declaration that he held it in trust. So much of the decree as adjudged title to the farm in Judge Gaugh under a resulting trust should be reversed.

III. The scope of the allegations, and the relief sought under the second amended petition, require that the status of the ownership of the shares of the Queen City Company be determined. In respect to that claim, and in that suit, appellants contend that they became the equitable owners of all the stock of that company, on delivery of their deeds in June, 1917; and further, that by affixing his signature to an assignment of the stock certificates at the time of the delivery of the deed, Judge Gaugh created an express trust in that stock for the benefit of appellants; and, that since he paid nothing into the capital stock of the Queen City Company there could be no resulting trust in his favor in respect to that stock; but that if appellants did not obtain title to the stock in accordance with the alleged agreement, a resulting trust arose in their favor, by their conveyance of their properties to the Queen City Company. Appellants also make the further claim that respondents are bound by the testimony of Walter Gaugh as to what he took from the safety deposit box; and complain of the action of the court in excluding the statement of Mort Gaugh and Mr. Longnecker, that it was the agreement and understanding that Judge Gaugh should have no interest in the stock which might stand in his name. As to the statements so excluded, they were statements in the form of conclusions.

First, as to the contention that because respondents made Walter Gaugh their witness, they are bound by his statement that he took nothing from the safety deposit box. Counsel cite Manchester v. Harrington, 199 S. W. 242; Claflin v. Dodson, 111 Mo. 195; Rodan v. St. Louis Transit Co., 207 Mo. 394, 403. These cases announce the doctrine that a party who calls his adversary as a witness cannot directly impeach him. In those cases statement is made to the effect that the witness sustained himself consistently under examination. That cannot be fairly said of the testimony of Walter Gaugh in this case. The rule applicable under the circumstances here shown, is stated in Black v. Epstein, 221 Mo. l. c. 304: "The rule applicable

to this proposition is that where one party calls the other as a witness he will not be allowed to directly impeach his credibility, but where the evidence of such witness is contradictory, tending to show that the witness is inclined to prevaricate and what he says is not strictly in accord with the truth, the court or jury will still be authorized to place the proper estimate on it. [Chandler v. Fleeman, 50 Mo. 239.]'' Contradictions and evasions appear in the testimony of appellants as witnesses, upon the question of ownership of this stock, and where and by whom it was kept. While respondents did not and could not attempt directly to impeach them, the whole of the testimony of appellants was for consideration by the court in its relation to all the other evidence.

Appellants argue that Judge Gaugh created an express trust for appellants in the shares of stock, by his assignment of the certificates, his disavowal of any interest in the stock, and his agreement that his sons should own all the stock. It is urged that shares are personal property, under the statute, and that an express trust in personal property may be declared by parol. and so proven. Founded upon the same assumption of facts, it is argued there could be no resulting trust in favor of Judge Gaugh in any of the property which stood in appellants' names and was conveyed by them to the Queen City Company; and, that if appellants did not obtain title to the stock in accordance with the agreement with their father, a resulting trust arose in their favor by reason of their conveyance of their real estate to the Queen City Company. The conclusions urged take life only if the facts assumed are conceded. As to all these contentions which would reach the same result, the paramount inquiry is as to the facts, and the reasonable inferences to be drawn therefrom. The reasonable inference is that the certificates were in the possession of Judge Gaugh. There is the testimony of the appellants to the effect that they were the beneficial owners of the properties conveyed to the Queen City Company. The conditions or theories advanced under which appellants claim ownership of all the shares, are to be considered in the light of the evidence as to the value of the properties involved in these suits, the relation of the parties and their probable financial condition, and further, in view of the evidence tending to show that appellants appropriated, and concealed or destroyed, evidence of the real ownership of the properties. We have heretofore stated the evidence as to the values of the various properties. From that, it appears that the aggregate net value of the real estate—that in the name of Judge Gaugh. that in the name of Mort Gaugh, and that in the Queen City Company—was $168,000, and of this, the net value of that held by Judge Gaugh was $28,000 in round numbers, or, only one-sixth of

the total. The disparity is unreasonable. There is another matter connected with these values, not easily understood. According to the testimony and contention of the appellants Mort Gaugh owned and conveyed to the Queen City Company properties valued, as of 1922, at $73,250, and Walter Gaugh owned and conveyed to the Queen City Company a property valued at $20,000. Yet, the case of appellants goes upon the theory that in ownership of the shares representing those values, they were on an equality. Additional to that, the fact appears that the values placed upon the properties held by Mort Gaugh in his own name—the Courtney farm and the Ninth street property—amounted to $47,000. With those conveyed by him to the Queen City Company, valued at $73,250, there results an aggregate of $120,750. There is nothing in the record which gives satisfactory proof that this could be so. There is nothing shown which bridges the wide chasm between the claims of appellants on the one hand, that they owned so much, and of respondents on the other that appellants owned nothing. These properties of such great value conveyed to the Queen City Company, were acquired while Judge Gaugh appears to have been the owner of the printing and binding business, and his sons were merely assisting him in the business, and a considerable period of years before he turned the business over to them. It is conceded that he furnished money for the interest conveyed by Walter Gaugh in the property at 408-410 Admiral Boulevard, which makes it appear the more unreasonable that the large accumulations of Mort Gaugh were his solely. No adequate explanation has been given. We are unable to reconcile the manner in which these shares were issued, with appellants' theory that Judge Gaugh had no ownership interest in the Queen City Company, and was given shares merely to qualify him as president of the company—a place which appellant wanted him to occupy during his lifetime as a compliment to him. If that were so, why issue to him almost all of the shares?

In the action taken in June, 1917, certificates for seventy-seven shares were issued to him, and he indorsed them. At the same time certificates, for one share each, were issued to the appellants which they indorsed. The reason for these converse acts is not explained. Appellants had some testimony that the shares were delivered to them respectively, at that time, but the testimony on that subject is not satisfying, and their testimony as to where these certificates were kept is evasive and contradictory. There is no explanation of the rather singular circumstance that the revenue stamps affixed to the indorsement of these shares, said to have been made on June 11, 1917, were, in fact, stamps not issued, nor obtainable, until 1918. Earl Rankin testified that there were no stamps on these certificates when he saw them at the meeting held on September 19, 1922.

From the conduct of appellants and of Karalee Rankin, as shown by their own testimony and by circumstances otherwise appearing in the record, certain things are reasonably clear. They were agreed upon one point—that respondent, Maude Gaugh, should have as little benefit as possible from the estate. It is clear that Mort Gaugh intended that Karalee Rankin should account for the $2500 obtained from her father, but he at no time mentioned that transaction to Maude Gaugh as administratrix. Karalee Rankin's position was that the $2500 was a gift, and she was not admitting that it should be charged against her share in the estate. In the period following Judge Gaugh's death, and while she remained in Kansas City, she was willing for appellants to withhold from their stepmother any knowledge of an interest of her father in the Queen City Company property, or other property not standing openly in his name, and willing that the stepmother should have no share in such property, and she then conveyed to Maude Gaugh no information of what her brothers were saying to her, about having "gone south with everything;" but, was demanding that if the stepmother were settled with, or excluded, she (Mrs. Rankin) should have a share equal to that of each of her brothers. They were refusing to make any agreement in writing, and probably denying her right to a share equal to theirs. Thus they stood, when Karalee Rankin returned to New York. Then followed the settlement between Mort Gaugh and Maude Gaugh in December, 1922. As to what communications took place, if any, between Karalee Rankin and her brothers between December and the April following, the record is silent. But, at any rate, in April, Mrs. Rankin returned to Kansas City, and after her return told Maude Gaugh of the statements made by Mort Gaugh, and began taking depositions, and making preparations to prosecute the suits, which had been filed by Maude Gaugh. These circumstances, added to the other testimony direct or circumstantial, lend credence to the testimony of Karalee Rankin that her brothers, and especially Mort Gaugh, told her they had taken, or made away with, everything that could be of benefit to the widow, so that the widow would have to take whatever they saw fit to give her, of the property, other than that standing unquestionably in the name of Judge Gaugh.

There is evidence in the record that Mort Gaugh, in addition to assisting in carrying on the printing and binding business, was for a time engaged on the side, in selling automobiles for a dealer whereby he earned some commissions; also that on occasions he sold diamonds on commission; and for a time, in his younger days it seems, served as a policeman. But taking all this evidence together, two things seem reasonable· First, that Judge Gaugh was the real owner of far more than that which stood of public record in his name,

and next, that there was a concealment or destruction of records and documents bearing upon the question of ownership of these shares in the Queen City Company, and possibly of other property.

IV. This court has several times given effect to the rule that where a party to a suit has been guilty of spoliation of documentary evidence, he is held thereby to admit the truth of the allegation of the opposite party, and this upon the ground that the law, in consequence of the fraud practiced, in consequence of the spoliation, will presume that the evidence destroyed will establish the other party's demand to be just. [Pomeroy v. Benton, 77 Mo. 64, 85; Hunt v. Sanders, 288 Mo. 337, 351; Haid v. Prendiville, 292 Mo. 552, 565.] See also Tracy v. Buchanan, 167 Mo. App. 434; Stuckes v. National Candy Company, 158 Mo. App. 359; Shawhan v. Shawhan Distillery Company, 195 Mo. App. 450, 495. This record shows Judge Gaugh for a long period of years was proprietor of a business which was a prosperous business; and while his sons worked with him in the business, he did not turn it over to them until he was far advanced in years, and had been elected a county judge; and, holding that office, could not continue to furnish books to the county. In that long period he alone, or he in some sort of connection with his sons, and especially with Mort Gaugh, took part in many transactions. To us the claim that the sons had accumulated property several times as valuable as the property owned by him seems unreasonable. It seems unreasonable too that his personal representative could find virtually nothing to disclose the condition of his estate. Circumstances warrant the belief that appellants did not leave undisturbed, his effects, and the evidence of the real extent and situation of his property; and on that account the presumption must go against them.

V. Error is assigned in the action of the court in cancelling the conveyance from Maude Gaugh to Mort Gaugh upon the ground that she did not offer to refund the money she received but only stated her willingness to account for it with the administrator and her co-heirs. The statement in the second amended petition was that respondent "is desirous to do equity, and is willing to account to the administrator of the estate and to the co-heirs of the deceased for the $12,900," followed by the averment that her share of the personal property was of the value of $50,000 and far exceeded the sum of $12,900. This, with the general prayer for relief, was sufficient to invoke the power of the court to prescribe and impose upon respondent the duty to

account for what she had received, as the price of the decree, and it was not necessary to tender actual payment of the money received. In Whelan v. Reilly, 61 Mo. 565, it was said at page 570, that the rule that he who seeks equity must do equity, "finds its application, not in questions of pleading, nor by what the plaintiff offers to do therein, but in the form and frame of the orders and decrees, both interlocutory and final, whereby equitable terms are imposed as a condition precedent to equitable relief granted." [See also Paquin v. Milliken, 163 Mo. 79, 104-106; Peak v. Peak, 228 Mo. 556.]

It is further urged that respondent's attempted rescission came too late. Counsel cite Estes v. Reynolds, 75 Mo. 563; Taylor v. Short, 107 Mo. 384; Morgan Coal Company v. Halderman, 254 Mo. 596, 651. The first of these cases mentioned was a suit at law for damages for fraud and deceit. The others were suits in equity. The rule to which the respondent was subject was that she should act in a timely manner, and the length of time may "depend upon the circumstances," as was said in the Halderman case. There is and cannot well be an absolute rule upon this subject. Each case is to be determined according to its own particular circumstances. Maude Gaugh testified that she first learned in April, 1923, that the appellants or one of them had been in the safety deposit box at the Commerce Trust Company; that this was told to her by Karalee Rankin, who said that she knew they had entered the box and taken papers. Her testimony is that Mort Gaugh began efforts to settle with her not long after her husband died; that he came to see her on two or three occasions and procured one or more other persons to see her. Mr. Tucker, a member of the firm engaged by her in the matter of the estate, testified when the cause was reopened, that he did not advise her in making this settlement; that the settlement was consummated in his office, but that he did not advise, because the parties came, saying to him that they had agreed upon a settlement. After that, in April, 1923, came the information that the safety deposit box had been entered, and papers taken; and later the cause went to trial, and while under advisement, the court permitted it to be reopened, the second amended petition to be filed, and the evidence to be taken. The trial judge was familiar with the facts and circumstances surrounding the parties and the property. No change in the condition of properties or the parties was shown making it inequitable to demand a rescission.

The question whether the respondent Maude Gaugh, acted with reasonable promptness under the conditions existing, or was guilty of laches, was one addressed to the sound discretion of the court. [Kellogg v. Moore, 271 Mo. 189; Troll v. St. Louis, 257 Mo. 626; Marshall v. Hill, 246 Mo. 1; Pike v. Martindale, 91 Mo. 268.] Its finding upon that issue will not be disturbed.

The court made its order, cancelling the conveyance in view of all the evidence in both cases, upon the finding in this case that the Courtney farm was the property of Judge Gaugh, and, evidently in view of the finding in the suit of the administrator that the seventy-seven shares of stock of the Queen City Company were also the property of Judge Gaugh at the time of his death, and belonged to his estate. We hold the plaintiff failed to establish a resulting trust in the Courtney farm, and so much of the decree is reversed; but, we hold that the conveyance should be cancelled in so far as it operated as an assignment of the interest of the respondent in the seventy-seven shares of stock of the Queen City Company. An accounting can be had as between the respondent Maude Gaugh and the appellants, and appropriate orders can be made to that effect. The court can modify the judgment herein as heretofore indicated, taking into consideration its decree in favor of the administrator in the other suit, affirmed on the appeal in that suit.

The judgment herein is reversed and the cause remanded for modification of the judgment as above directed.

PER CURIAM:—This cause coming into Court en Banc from Division One, the foregoing divisional opinion by LINDSAY, C., is adopted as the decision of the court. *Ragland, Atwood, Walker* and *Gentry, JJ.,* concur; *Gantt, J.,* concurs in the result; *White, C. J.,* and *Blair, J.,* dissent.