259 S.W.2d 807 (1953)
GARRETT
v.
TERMINAL R. ASS'N OF ST. LOUIS.
No. 43300.
Supreme Court of Missouri, Division No. 2.
July 13, 1953.
*808 Warner Fuller, Arnot L. Sheppard, St. Louis, for appellant.
Forrest Boecker, Clayton, for respondent.
TIPTON, Judge.
In the circuit court of the city of St. Louis, respondent brought this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The jury returned a verdict for $25,000, but that amount was reduced to $18,500 by a remittitur and a judgment was entered for that amount.
Respondent had been in appellants' employ for over 30 years as a switchman. His home station was the Bremen Avenue Yard in St. Louis, Missouri. On June 8, 1951, he assisted in taking a train across the Mississippi River to the Madison Yard, Illinois. He was the rear brakeman on that train. For this trip the crew was furnished a shelter cab, which is a cab carried on a flat car. The car's number was 544. A shelter cab is about 6 feet long and the same width as a box car. Inside the cab are board seats, a stove and closet. There is one center plate bolted to the floor of the car. Another plate is bolted on the bottom of the cab and that plate fits into the center plate which is bolted to the floor of the car. These plates hold a center pin which, in turn, holds the car to the bolster. There was substantial evidence that there were bolts missing from each of the center plates.
Respondent testified that if bolts were missing, the center plates would be loose, and this would cause a vibration of the center pin that would make the car rock and bounce. He further testified that on the trip to the Madison Yard he noticed a lot of "jumping of the car," and "it is the roughest car in which I ever rode." He also testified that when the train arrived at the Madison Yard he walked around the car to bleed it and noticed a "bad order card" on the opposite side from which he boarded the train. He took this bad order card from the car. He then called the yardmaster and told him about it. The yardmaster told respondent that the crew would have to go back in the same car. He further testified that he did not read the bad order card until his train reached the Twenty-third Street Yard on its return from the Madison Yard. When he went home he took this bad order card with him.
When Bremen Avenue was reached it was respondent's duty to go to the back of the train to "show" himself to the men in the tower or to the yardmaster so if anything *809 was wrong with the train a signal might be given him. Respondent testified that he rose from his seat to make this appearance but he was unable to do so as he was thrown backwards and fell in the corner of the seat he had been sitting on. He testified that he was knocked down by "the rough riding and jumping of the car," and struck the lower part of his spine or tail bone. He stated that when he regained consciousness he pulled himself back upon the seat and remained there until the train stopped in the Twenty-third Street Yard. He then telephoned to Elwood Davis, one of appellant's superintendents, and told Davis how he had been hurt. Davis asked respondent to help bring the train back to the Bremen Yard and he complied with this request. Respondent's tour of duty for that day was completed when the train was brought there.
Was it error for the trial court to admit in evidence respondent's exhibit 1, which was a photostatic reproduction of what was purported to be a bad order card which respondent said he removed from the car in which he was riding on the day of his alleged injury?
This offer was objected to by appellant for the reason that it was not the best evidence. In other words, this exhibit was not the original bad order card but only a photostatic copy of the original.
In order to determine if the original of exhibit 1 was in existence at the time of the trial or if it had been destroyed, and if it had been destroyed, by whom and for what purpose, if any, we deem it necessary to extensively quote from the record. The record shows that the following occurred without the hearing of the jury:
"The Court: What do you mean, `there is no better evidence'? Did you serve notice to produce the original?
"Mr. Sheppard: We haven't got it, we never heard of it.
"Mr. Boecker: Their testimony is there was no such card.
"The Court: Well, then, it is admitted that
"Mr. Boecker: On deposition.
"The Court: All right, then I will overrule the objection.
"Mr. Sheppard: Plaintiff's counsel stated that he took this card off, plaintiff took it off and had it photostated. There isn't any evidence that anybody ever saw it before or afterwards, so it was in his possession.
"Mr. Boecker: It is for this witness to say.
"The Court: Where would the original be, are you going to explain that?
"Mr. Boecker: So far as I know it must have been destroyed.
"The Court: By whom?
"Mr. Boecker: I don't know.
"Mr. Sheppard: As far as this record shows, the last time it was heard of, it was in the plaintiff's hands.
"Mr. Boecker: That is what I have said.
"The Court: Is it or is it not in existence, that is what I have got to first decide, because a photostat wouldn't be competent until the original has been accounted for. If it isn't available, all well and good, but it has got to be accounted for. If it is still in existence, it should be produced.
"Mr. Boecker: To my knowledge it is not in existence.
"Mr. Sheppard: I want to see this original.
"Mr. Boecker: The testimony of the rip track foreman on this deposition was that the car had been had ordered.
"The Court: What is your man going to testify?
"Mr. Boecker: That he sent it back to them.
"The Court: He is going to testify to that?
"Mr. Boecker: That is right.
"The Court: After he had this picture taken, he sent it back?
"Mr. Boecker: That is right.
"The Court: In what way?
"Mr. Boecker: I don't know about that.

*810 "The Court: You better talk to him and let's find out, because I don't want to admit something in here and later on exclude it. What is the evidence going to show with reference to it?
"Mr. Sheppard: Just look at that with those numbers all written over.
"Mr. Boecker: That is a matter for cross-examination. He said that the original was destroyed.
"The Court: By whom?
"Mr. Boecker: By himself.
"The Court: You mean after he had the picture taken, he destroyed it?
"Mr. Boecker: After he had the picture taken, he destroyed it.
"Mr. Sheppard: I would like to cross-examine the gentleman about that before this is put in evidence, because I think this is phony.
"Mr. Boecker: I submit it is not. I haven't had an opportunity to ask this witness if it refreshes his recollection. I think this witness is the proper one to relate.
"The Court: Under those circumstances I will overrule the objection. If that is going to be the testimony, of course, this is the next best evidence."
During the cross-examination of respondent about the original of exhibit 1, he testified as follows:
"Q. Who made that photostat of that card? A. Stobie.
"Q. Did you take it down there? A. No, sir, I didn't.
"Q. Who did? A. The wife.
"Q. Where had it been from June the 8th, 1951, until October or November, 1951? A. I had it in my possession.
"Q. You took it off of this caboose on June 8th, 1951, didn't you? A. Yes, sir.
"Q. And you said awhile ago that you took it off for fear it would get lost and the company wouldn't see it, didn't you? A. Well, I taken it off for my own benefit. * * *
"Q. What did you do with it after you took it home? A. Well, I laid it away, I put it in my papers or something. I don't remember where it was laid until I just happened to think one day. It was in such bad condition I was going to try to get a photostat of it.
"Q. You realized it was of importance to you, didn't you? A. Well, that is the reason I taken it with that intention, yes, sir.
"Q. But you didn't know where you kept it? A. I kept it in my house.
"Q. I know, but where? A. Well, I would say it was in my paper bill book.
"Q. And where did you keep that bill book? A. Right in here where I have got this one.
"Q. In your pocket? A. Yes, sir.
"Q. So you carried it in your pocket every day, did you, from the time you took it off of the car until you had it photostated? A. I did.
"Q. You did? As far as I remember.
"Q. When you went back to work the next day over there, you had it in your pocket, did you? A. I wouldn't say that. I never carried my billfold with me when I was working.
"Q. Did you have it folded up? A. No.
"Q. Well, what did you mean by my billfold then? A. (Indicates.)
"Q. That is what you mean? A. Yes, sir, it lays right in it.
"Q. And you don't have to fold it? A. No, sir.
"Q. Is it in your billfold now? A. No, sir.
"Q. Where is it? A. I couldn't tell you. It was disposed of after the picture was made. I don't remember whether the wife ever brought it home or what. I had no more use for it after I had the photostat, that is all I wanted.

*811 "Q. Well, you threw it away, in other words? A. As far as I know, yes, sir.
"Q. Or did you burn it up? A. I didn't burn it up, no.
"Q. You just let it alone and you didn't care what happened to it? A. That is true.
"Q. I see. Did you show it to anybody? A. No. sir.
"Q. At any time? A. No. sir.
"Q. What sort of shape was it in by November? Was it ragged, torn? A. It was in pretty bad condition, yes, sir.
"Q. Pretty bad shape? A. It was.
"Q. Justthe edges were torn and rough and worn out, were they? A. Yes, sir.
"Q. And the corners torn off? A. It was.
"Q. And how many photostatic copies did you have made? A. Just one, I believe."
The above quoted admissions of respondent's attorney and respondent's testimony were inconsistent and unsatisfactory as to what became of the original of exhibit 1. The only conclusion that can be drawn from these admissions and testimony is that the respondent intentionally destroyed the bad order card, since there is not the slightest evidence that he made any effort to produce it.
The preliminary proof of the loss or destruction of the primary evidence, namely, the original bad order card, is not to be regarded as evidence in the cause. It was addressed solely to the trial court, and its sufficiency was a question for the trial court and not for the jury. The sufficiency of the evidence on the preliminary proof rested in the sound discretion of the trial court whose determination will not be disturbed by an appellate court, although it is reviewable and may be overruled when an abuse of discretion amounting to error of law appears. Scrivner v. American Car & Foundry Co., 330 Mo. 408, 50 S.W.2d 1001; Bullock v. Johnson, 350 Mo. 443, 166 S.W.2d 573.
Under this record, we do think the trial court abused his discretion amounting to an error of law in admitting respondent's exhibit 1. If it were possible to conclude from the preliminary proof that the original was still in existence, then exhibit 1 was not admissible because respondent did not show any diligence in attempting to locate the original card. Bullock v. E. B. Gee Land Co., 347 Mo. 721, 148 S.W.2d 565. However, as we have already said, the only reasonable conclusion to be drawn from the above quoted admissions and testimony from the preliminary proof is that respondent intentionally destroyed the original of exhibit 1.
Respondent's attorney admitted to the trial court that "after he (respondent) had the picture taken, he destroyed it." Respondent testified he could not tell where it was. "It was disposed of after the picture was made."
David Earl Smith, a witness for respondent, testified that he was a car inspector for appellant. When shown exhibit 1 he was asked if he could identify it. His answer was, "Photostat of a bad order card that I made out." Exhibit 1 was a photostat of a card, and across the top of it the words, "Bad Order," were printed in large type. Below that was printed the word, "Defect." Following that word, Smith had printed by hand the following, "Cotter Keys Missing in Pin Lifter Brackets A End & Flat Wheels," and it was signed by this witness.
While the appellant was introducing its evidence, Smith was recalled to clarify his previous testimony. He testified that he was asked to report to Mr. Klein, who was the head claim agent for appellant. When he reported to Klein's office he was asked to print "Cotter Keys Missing in Pin Lifter Brackets in A End & Flat Wheels," which he did. He was then asked to compare what he had just printed with the same he did. He was then asked to compare what he had just printed with the same words that were on exhibit 1. When he did so he discovered that "& Flat Wheels" was not his printing. He later was recalled by respondent in rebuttal and testified as follows:

*812 "Q. Now, on that `& flat wheels' do you have any doubts about that or are you positive about that? A. No, sir, I did not write that.
"Q. Positive about that? A. Absolutely."
On behalf of appellant, George G. Swett testified that he was "an examiner of questioned documents, commonly referred to as a handwriting expert," and that, in his opinion, witness Smith did not print the words, "& Flat Wheels," that appeared on exhibit 1.
So, the issue in regard to exhibit 1 between the parties to this litigation is: Did the original bad order card have the words, "& Flat Wheels," on it?
The law is well settled that the destruction of written evidence without a satisfactory explanation gives rise to an inference unfavorable to the spoliator. Weir v. Baker, 357 Mo. 507, 209 S.W.2d 253; Griffith v. Gardner, 358 Mo. 859, 217 S.W. 2d 519. We find nothing in this record that satisfactorily explains why the original bad order card was not produced by respondent except that it had been intentionally destroyed by respondent. His testimony was very unsatisfactory in reference to the original card and what became of it. It is to be remembered that he testified, "I had no more use for it after I had the photostat, that is all I wanted."
"This court has several times given effect to the rule that where a party to a suit has been guilty of spoliation of documentary evidence, he is held thereby to admit the truth of the allegation of the opposite party, and this upon the ground that the law, in consequence of the fraud practiced, in consequence of the spoliation, will presume that the evidence destroyed will establish the other party's demand to be just. Pomeroy v. Benton, 77 Mo. 64, 85; Hunt v. Sanders, 288 Mo. 337, 351, 232 S.W. 456; Haid v. Prendiville, 292 Mo. 552, 565, 238 S.W. 452. See, also, Tracy v. Buchanan, 167 Mo.App. [432], 434, 151 S.W. 747; Stuckes v. National Candy Co., 158 Mo.App. [342], 359, 138 S.W. 352; Shawhan v. [Shawhan] Distillery Co., 195 Mo.App. [445], 450, 197 S. W. 369, and Shawhan v. [Shawhan] Distillery Co., 195 Mo.App. [492], 495, 197 S. W. 371." Gaugh v. Gaugh, 321 Mo. 414, 11 S.W.2d 729, loc. cit. 748.
Under the law above quoted from the Gaugh case, we must hold under the facts in this record that respondent must, in law, admit to the truth of appellant's contention that the words, "& Flat Wheels," were not on the original bad order card.
There is no other evidence that the wheels were flat. In testifying about the bad order card the respondent said, "When I seen the flat wheels on there I knew that was bound to be the cause of the rough riding." He did not testify that he saw flat wheels on the car, or that, in his opinion, the rough riding was caused by flat wheels. Nor did any other witness testify that there were flat wheels on the car. In fact, respondent's witness William C. Morrison testified that he personally inspected the car in question and supervised the repair work on it, and that it did not have flat wheels.
The case was submitted to the jury on the theory that flat wheels in connection with loose and missing center bolts were the direct and proximate cause of respondent's injuries. Of course, from what we have just ruled with reference to exhibit 1, such submission was error. We decline to rule whether the loose and missing bolts alone could be the proximate cause of respondent's injuries. We are of the opinion that the ends of justice will more properly be attained if the cause is reversed and remanded without any direction from us so that the parties to this action may proceed as they see fit.
The cause, therefore, is reversed and remanded.
All concur.