

# Missouri Court of Appeals
## Southern District
### In Division

KENNETH D. GILMORE, )
)
    Respondent, ) No. SD37344
)
v. ) **Filed: November 14, 2022**
)
MISSOURI DEPARTMENT OF SOCIAL )
SERVICES, CHILDREN'S DIVISION, )
)
    Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF SCOTT COUNTY

Honorable Stephen R. Mitchell, Judge

**<u>AFFIRMED</u>**

Appellant, the Children's Division of the Missouri Department of Social Services

("Children's Division"), appeals from a judgment in favor of Respondent, Kenneth D. Gilmore

("Gilmore"), in the amount of $441,130, following a jury trial in a negligence action. Gilmore

alleged he was injured when a rocking chair he was sitting in broke during a visit at the Sikeston

Children's Division office. The case was tried to a jury, which returned a verdict in favor of

Gilmore for $1,250,000, finding Gilmore 22% at fault. The trial court reduced the jury's award

of damages by 22%, and then applied the statutory cap in section 537.610, for a final award of

$441,130.[1]

---

[1] All statutory citations are to RSMo (2016).

Children's Division appeals from that judgment in four points. In point 1, Children's Division argues the trial court erred in denying its motion for judgment notwithstanding the verdict because the trial court wrongly interpreted the dangerous condition exception to sovereign immunity to include a claim arising from a "working" rocking chair. In point 2, Children's Division argues the trial court erred in granting the spoliation evidentiary inference about the rocking chair's defect, alleging the unrebutted evidence showed Children's Division intended to preserve evidence about the condition of the rocking chair. In point 3, Children's Division argues the trial court erred in admitting the phrase "we owe" into evidence because it was a preliminary determination made during a settlement negotiation. In point 4, Children's Division argues the trial court erred in reducing the jury's award of damages in proportion to Gilmore's comparative fault rather than first applying the statutory cap to the jury's award, and then reducing the statutory cap by that amount. Finding no merit in Children's Division's points, we affirm.

**Facts and Procedural Background**

*The May Incident*

On May 15, 2015, Gilmore attended a supervised visit between his infant granddaughter and his son at Children's Division in Sikeston. The visitation room contained a one-way mirror which allowed Children's Division employees to watch visitations. At that time, the room contained a big blue couch, a bookshelf with kids' books, and a rocking chair donated by a former employee.

Gilmore and his son were sitting on the couch when Gilmore's granddaughter became fussy. Gilmore thought rocking her might comfort her, so Gilmore, a large man over six feet tall and over three hundred pounds, sat down in the rocking chair. He testified, "When I rocked backwards—When I started rocking her, when I rocked back, the arms popped up and the back broke off." He "fell straight back," his shoulders hitting the floor, and his head hitting the wall,

but he hung on to his granddaughter.  Gilmore wiggled around and got to his feet without help. He felt a "real hard stabbing, burning pain in [his] lower back and down [his] hip."  He handed his granddaughter to a Children's Division employee and tried to walk off the pain.

Gilmore completed an incident report before he left.  He noted that he "[c]aught [himself] before [he] actually hit the floor, and [] didn't drop the baby."  The next morning, Gilmore went to the doctor because he "couldn't hardly walk."

Gilmore's former girlfriend, Patty Maxwell ("Maxwell"), had also visited Children's Division with Gilmore on five or six earlier occasions before the May incident.  Approximately two weeks before the May incident, Maxwell sat in the chair and discovered that the arms of the chair "c[ame] up off the chair" and were not properly secured when she grabbed them.  After the arms came off, the chair didn't feel right—it "felt wobbly."  Knowing that Children's Division staff were listening and observing the visit through the one-way mirror during the supervised visitation, Maxwell sarcastically commented, "This is really safe to be in a safe room[,]" referring to the rocking chair.  On that same day, Gilmore advised a Children's Division employee the arms of the rocking chair had come off.  Gilmore believed "the chair had serious problems" but "made no effort[] to inspect the chair before [he] sat in it" during the May incident.

*The Investigation and Disposal of the Rocking Chair*

A Children's Division employee immediately submitted an incident report that was reviewed by Rebecca Shavers ("Shavers"), a Risk Management Specialist for the State of Missouri Department of Insurance ("DI").  Shavers had worked with injury claims since 1998 but became a Risk Management Specialist in January 2011.  Children's Division employees took photographs of the broken chair from two angles.  One photo showed "[t]he back of that chair is completely separated from the base of it[.]"  Shavers requested and reviewed the photographs of the rocking chair and the area where it was located.  Shavers also asked Children's Division if there was video of the May incident, and if so, to "preserve this evidence and forward a copy of the same to this office for review."  There was no video of the May incident.

3

A few days after the May incident, Shavers instructed Children's Division employees "[i]f the chair has not already been removed, please dispose of it properly." She "did not want anybody else being injured after we had constructive notice" in case "somebody tried to put it back together." The broken rocking chair was then placed in the dumpster and disposed of.

Gilmore called Children's Division numerous times stating he needed to see a doctor but no one would take him. On May 18, 2015 Shavers left a voicemail for Gilmore, explaining they were still conducting the investigation. On May 20, 2015, Shavers discussed the claim with her supervisor. Shavers believed the State should not pay because she "did not feel that the State of Missouri had constructive notice that there was a potential dangerous condition of property." Her supervisor overruled her. After the discussion with her supervisor, Shavers noted in the claim record "we owe, there is a reasonable expectation that the chair should have been safe to sit in and that there's no weight limit issue." The claim record also stated "we've accepted liability" and that "once [Gilmore] is released from treatment, which is NOT directed by this office, he may submit all medical records and invoices to our office for consideration." For the next three years, DI corresponded with Gilmore. Gilmore filed suit on April 30, 2018.

*The Negligence Lawsuit*

Gilmore's First Amended Petition alleged that Children's Division's premises were "dangerous and not reasonably safe" because they had "a rocking chair that was defective and not safe for its intended use." The petition also claimed the disposal of the rocking chair "before it could be examined or otherwise evaluated" was "further proof of the defective and unsafe nature of the rocking chair[.]" Children's Division denied the allegations and argued sovereign immunity barred the suit, that the suit was subject to the liability cap under sections 537.600-615, and that Gilmore did not use ordinary care by sitting in a chair he believed to be unsafe.

After discovery, Gilmore filed a motion for spoliation, alleging that by discarding the chair, he was "prevented from the best and only physical evidence to support his claim." Children's Division argued the spoliation request was inappropriate "unless the [c]ourt finds an

4

intentional destruction of evidence indicating fraud and a desire to suppress the truth," and that the evidence showed there was no such intent because the chair was disposed of due to safety concerns.  Gilmore's spoliation motion was granted and, at trial, Gilmore was permitted to read to the jury, "Defendant admits that an examination of the chair, which was discarded, would have resulted in evidence unfavorable to its position that the chair was not dangerous."

Before trial, Children's Division moved to exclude the introduction of DI's statement "we owe this claim, there is a reasonable expectation that the chair should be safe to sit in[,]" arguing that the statement was inaccurate, preliminary, and made by non-attorneys.  The trial court denied Children's Division's motion.  Gilmore introduced the "we owe this claim" statement at trial.  Children's Division did not object.

At trial, the jury heard from Gilmore, Maxwell, and two Children's Division employees. Video depositions of Gilmore's medical evaluator and Shavers were also introduced.  The jury heard about Gilmore's surgeries and associated costs totaling $628,211.87.

After deliberations, the jury returned a verdict against Children's Division in the amount of $1,250,000, finding Gilmore 22% at fault.  The trial court reduced the jury's award of damages by 22%, and then applied the statutory cap in section 537.610, resulting in a judgment against Children's Division in the amount of $441,130.

Children's Division moved for a new trial and judgment notwithstanding the verdict, arguing that the spoliation adverse inference was improper, that the evidence was insufficient to show the rocking chair was a dangerous condition, that the trial court improperly admitted inadmissible and prejudicial evidence, and that the trial court improperly applied the comparative fault percentage to the award and not to the statutory cap.  The trial court denied Children's Division's motion.  This appeal followed.

**Discussion**

*Point 1: Denial of Judgment Notwithstanding the Verdict*

In its first point, Children's Division argues the trial court erred in denying its motion for judgment notwithstanding the verdict because it wrongly interpreted the dangerous condition exception to sovereign immunity to include a claim arising from a "working rocking chair." According to Children's Division, the evidence was insufficient to support the verdict because the rocking chair did not pose a physical threat to Gilmore, and no evidence showed Children's Division's premises were dangerous.

In reviewing a trial court's denial of a judgment notwithstanding the verdict, we must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability. *City of Harrisonville v. McCall Serv. Stations*, 495 S.W.3d 738, 748 (Mo. banc 2016). We view the evidence in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences. *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013). We will reverse a jury's verdict for insufficient evidence only where there is "a complete absence of probative fact to support the jury's conclusion." *Id.* (quoting *Dhyne v. State Farm Fire and Cas. Co.*, 188 S.W.3d 454, 457 (Mo. banc 2006)).

Under section 537.600.1, public entities are generally immune from suits for their negligent acts. *Kraus v. Hy-Vee, Inc.*, 147 S.W.3d 907, 914 (Mo. App. W.D. 2004). While that is the general rule, the statute expressly waives immunity from liability and suit for compensatory damages for:

> Injuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that either a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition or a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

§ 537.600.1(2).[2]  We strictly construe statutes waiving sovereign immunity.  ***Wellner v.***

***Director of Rev.***, 16 S.W.3d 352, 354 (Mo. App. W.D. 2000).  Thus, to state a claim against a

public entity for negligence under this exception, the plaintiff must show:

> (1) a dangerous condition of the property; (2) that the injuries directly resulted
> from the dangerous condition; (3) that the dangerous condition created a
> reasonably foreseeable risk of harm of the kind which was incurred; and (4) that
> a public employee negligently created the condition or that the public entity had
> actual or constructive notice of the dangerous condition.

***Necker by Necker v. City of Bridgerton***, 938 S.W.2d 651, 654 (Mo. App. E.D. 1997).

"Property" in the context of this statute refers to both real and personal property, and thus

includes the chair in this case.  ***Alexander v. State***, 756 S.W.2d 539, 541 (Mo. banc 1988).

The test for a dangerous condition is whether "the condition was dangerous because its

existence, without intervention by third parties, posed a physical threat to plaintiff." ***Necker***,

938 S.W.2d at 655.

Children's Division argues "a dainty rocking chair unable to bear a 6'2" tall and 325

pound man, without more, does not constitute a physical defect in the chair or Children's

Division's property."[3]  Like Children's Division's chair, this argument collapses.  While it is true

that Gilmore bore the burden of demonstrating some defect in the chair, Children's Division's

argument cannot stand because it is built upon a false premise—that there was "no evidence" of

a physical defect—and ignores our standard of review.  Under our standard of review, we must

view the evidence and the reasonable inferences therefrom in the light most favorable to the

jury's verdict.  ***Smith***, 410 S.W.3d at 630.  Here, both Maxwell and Gilmore testified about

physical defects in the chair.  Maxwell testified that when she sat in the chair two weeks before

the May incident, the arms came off and it "felt wobbly."  Gilmore also testified the arms of the

chair had come off during an earlier visit.  Finally, Gilmore testified that when he sat in the

---

[2] The statute contains another exception but that exception is not relevant to this appeal.
[3] In closing argument, Children's Division argued that the chair "was sturdy, it was a nice solid chair[.]"

chair, the arms popped off and the back broke off. Based on this evidence, it was reasonable for the factfinder to conclude the chair was defective. The evidence was sufficient to support the jury's conclusion that the rocking chair was a dangerous condition, waiving the State's sovereign immunity. Point 1 is denied.

*Point 2: Spoliation Evidentiary Inference*

In point 2, Children's Division argues the trial court erred in granting Gilmore the spoliation inference because the unrebutted evidence showed that Children's Division intended to preserve evidence about the rocking chair and there was no evidence that showed Children's Division destroyed the chair in bad faith. We review the trial court's ruling on evidentiary issues for an abuse of discretion. *Hill v. SSM Health Care St. Louis*, 563 S.W.3d 757, 761 (Mo. App. E.D. 2018) (applying abuse of discretion standard to spoliation analysis). An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration. *Id.* If reasonable people can differ as to the propriety of the trial court's action, then it is not an abuse of discretion. *Id.*

> "Spoliation is the intentional act of destruction or significant alteration of evidence." *Hill v. SSM Health Care St. Louis*, 563 S.W.3d 757, 761 (Mo. App. 2018). "Spoilators [sic] are subject to an adverse evidentiary inference where they are held to admit that the destroyed evidence would have been unfavorable to their position." *Tribus, LLC v. Greater Metro, Inc.*, 589 S.W.3d 679, 693 (Mo. App. 2019) (internal quotation marks omitted). "A determination that a party has committed spoliation must be supported by a finding or adverse inference of intent, and the party asserting spoliation has the burden to prove the opponent destroyed, altered, concealed, or suppressed the evidence at issue under circumstances manifesting fraud, deceit, or bad faith." *Ball v. Allied Physicians Group, L.L.C.*, 548 S.W.3d 373, 386 (Mo. App. 2018).

*Hale v. Burlington N. & Santa Fe Ry. Co.*, 638 S.W.3d 49, 77 (Mo. App. E.D. 2021).

The failure to adequately explain the evidence's destruction may give rise to an adverse inference. *Marmaduke v. CBL & Assocs. Mgmt., Inc.*, 521 S.W.3d 257, 269 (Mo. App.

8

E.D. 2017).  "In such cases, it may be shown by the movant that the alleged spoliator had a duty, or should have recognized a duty, to preserve the evidence."[4]  *Id.*

Here, Children's Division claimed it was instructed to dispose of the chair by Shavers, an experienced risk management officer for the State.  According to Shavers, she instructed Children's Division to dispose of the chair claiming safety concerns that someone might reassemble the chair and try to reuse it.  According to Children's Division, there was no evidence of bad faith justifying the spoliation finding.  However, the trial court was not required to believe the State's excuse for disposing of the chair.  **McCormick v. Cupp**, 106 S.W.3d 563, 569 (Mo. App. W.D. 2003) ("The fact-finder is free to believe all, none, or some of a witness's testimony.").  Moreover, Children's Division knew Gilmore had been injured because he filled out an incident report, notified them that his back was injured, and that he was seeking medical care.  Given Shaver's experience and expertise, it was reasonable for the trial court to infer that Children's Division should have known it had a duty to preserve the chair as evidence.  Under these circumstances, we cannot say the trial court's spoliation order was so unreasonable and arbitrary that it shocks our sense of justice.  Point 2 is denied.

*Point 3:  Admission of Statement "We Owe"*

In point 3, Children's Division argues the trial court erred by admitting the phrase "we owe" into evidence because it was a preliminary determination made during a settlement negotiation.  In its reply brief, Children's Division acknowledges it did not object during trial to the "we owe" statement that was the subject of its motions in *limine* and post-trial motion.  "A

---

[4] If the trial court finds spoliation of evidence occurred, the trial court may grant an adverse evidentiary inference in favor of the opposing party as a remedy.  **Pisoni v. Steak 'N Shake Ops., Inc.**, 468 S.W.3d 922, 926 (Mo. App. E.D. 2015).  "The adverse inference holds the spoliator to admit the missing evidence would have been unfavorable to its position."  **Id.** (citing **Garrett v. Terminal R. Ass'n of St. Louis**, 259 S.W.2d 807, 812 (Mo. 1953).  This does not, however, prove the opposing party's case.  **Id.** "Instead, the spoliator is left to determine whether any remaining evidence exists to support his or her claim in the face of the inference."  **Id.** (quoting **Schneider v. G. Guilliams, Inc.**, 976 S.W.2d 522, 526 (Mo. banc 2003)).

motion in *limine*, by itself, preserves nothing for appeal." ***Rhoden v. Missouri Delta Med. Ctr.***, 621 S.W.3d 469, 484 (Mo. banc 2021) (quoting ***Hancock v. Shook***, 100 S.W.3d 786, 802 (Mo. banc 2003)).  To preserve an evidentiary issue raised in a motion in *limine* for our review, a party must object to the introduction of evidence *at trial* and then reassert the objection in a post-trial motion.  ***Id.***  Children's Division, by failing to object to the introduction of the "we owe" statement at trial, failed to preserve this issue for our review.  Point 3 is denied.[5]

*Point 4:  Applying Comparative Fault to Jury's Award of Damages Before Applying Statutory Cap*

In point 4, Children's Division argues the trial court erred by applying Gilmore's comparative fault to the jury's award of damages *before* applying section 537.610's statutory cap.  The jury found Gilmore's damages to be $1,250,000 and found him to be 22% at fault.  The trial court then reduced Gilmore's award of total damages by his comparative fault percentage for a total of $975,000.  Because that amount exceeded the statutory cap of $441,130, the trial court capped liability at $441,130.[6]  According to Children's Division, this was the wrong formula—the trial court should have applied the statutory cap ($441,130) to the jury's award ($1,250,000) and then reduced the maximum allowed by the statutory cap by the percentage of fault assessed to Gilmore (22%), for a recoverable amount of $344,081.40.  We are unpersuaded by Children's Division's argument.

---

[5] Children's Division, in its reply brief, requests plain error review.  While we do have discretion to review unpreserved claims for plain error:

> plain-error review is rarely applied in civil cases and may not be invoked to cure the mere failure to make proper and timely objections.  Reversal for plain error in civil cases is only appropriate in those situations when the injustice of the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case.

***Ampleman v. Dish Network Serv., LLC***, 467 S.W.3d 845, 849 (Mo. App. S.D. 2015) (internal citations and quotations omitted).  We do not find "the injustice of the error[,]" if there is such error, to be so egregious as to weaken the very foundations of the process and undermine confidence in the outcome of the case.

[6] The Director of Commerce and Insurance calculates a new limit on awards for liability on an annual basis.  § 537.610.5.  The sovereign immunity limit "for any one person in a single accident or occurrence" effective January 1, 2021, was $441,130.  45 Mo. Reg. 1949, 1978 (Dec. 15, 2020).

This is a case of first impression in Missouri. Resolution of this point requires us to interpret section 537.610. We review questions of statutory interpretation *de novo*.

***Holesapple v. Missouri Hwy. & Transp. Comm'n***, 518 S.W.3d 836, 838 (Mo. App. S.D. 2017).

> The primary rule of statutory interpretation requires this Court to ascertain the intent of the legislature by considering the language used while giving the words used in the statute their plain and ordinary meaning. *Hamrick v. Affton School Dist. Bd. of Educ.,* 13 S.W.3d 678, 680 (Mo. App. 2000). "We must construe the statute in light of the purposes the legislature intended to accomplish and the evils it intended to cure." *Id.* This Court must avoid interpretations that are unjust, absurd, or unreasonable. *Id.* Accordingly, we consider the statute in the context of the entire statutory scheme on the same subject in order to discern legislative intent. *Jackson County Bd. of Election Comm'rs v. Paluka,* 13 S.W.3d 684, 690 (Mo. App. 2000).

***Benoit v. Missouri Hwy. & Transp. Comm'n***, 33 S.W.3d 663, 673-74 (Mo. App. S.D. 2000).

> Section 537.610.2, provides:
>
> The *liability* of the state and its public entities on claims within the scope of sections 537.600 to 537.650, shall not exceed two million dollars for all claims arising out of a single accident or occurrence and shall not exceed three hundred thousand dollars for any one person in a single accident or occurrence, except for those claims governed by the provisions of the Missouri workers' compensation law, chapter 287.

(Emphasis added). This statute is not ambiguous. The term "liability" is not defined in chapter 537, so we apply the plain and ordinary meaning of the term. "Liability" is defined as the "*legal responsibility* to another or to society, enforceable by civil remedy[.]" *Liability*, Black's Law Dictionary (11th ed. 2019) (emphasis added). Thus, under the statute, a public entity can only be *legally responsible* for the amount stated in the statute (except on workers' compensation claims), as adjusted on a yearly basis in accordance with the Implicit Price Deflator for Personal Consumption Expenditures.[7]

---

[7] Section 537.610.5 states:

> The limitation on awards for liability provided for in this section shall be increased or decreased on an annual basis effective January first of each year in accordance with the

At the time of trial, this amount for any one person in a single accident or occurrence was $441,130. 45 Mo. Reg. 1949, 1978 (Dec. 15, 2020).

While section 537.610.2 limits the amount for which a public entity can be *legally responsible* (i.e., liable), the statute contains no language limiting the amount of compensatory damages a jury can find against a public entity. Nor does it contain any language stating that when a plaintiff's recovery is reduced on the ground of comparative fault, the statutory cap, rather than the total judgment or verdict, should be reduced by the appropriate percentage. Such an interpretation would require us to insert language into the statute by essentially re-writing it, which we cannot do. The role of the judiciary is to "enforce the laws enacted by the legislature and to try to effectuate the legislature's intent." **Doe v. McCulloch**, 542 S.W.3d 354, 362 (Mo. App. E.D. 2017). The plain and unambiguous language of section 537.610.2 demonstrates an intent by the legislature to limit a public entity's liability to a plaintiff—not reduce the plaintiff's compensation. Thus, when a jury finds a plaintiff contributed to his damages, the trial court should compute the plaintiff's recovery by reducing the plaintiff's damage award in the proportion of the plaintiff's share of negligence. If that amount is still greater than the allowable recovery in section 537.610.2, as it was here, the plaintiff's recovery must be further reduced to comply with that statute.

This interpretation of the statute is consistent with how comparative fault principles are applied to a plaintiff's fault in other civil cases. Here, the jury was given Instruction Number 9, which stated:

Implicit Price Deflator for Personal Consumption Expenditures as published by the Bureau of Economic Analysis of the United States Department of Commerce. The current value of the limitation shall be calculated by the director of the department of commerce and insurance, who shall furnish that value to the secretary of state, who shall publish such value in the Missouri Register as soon after each January first as practicable, but it shall otherwise be exempt from the provisions of section 536.021.

12

**INSTRUCTION  NUMBER 9**

If you assess a percentage of fault to defendant then, disregarding any fault on the part of plaintiff, you must determine the total amount of plaintiff's damages to be such sum as will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained and is reasonably certain to sustain in the future that the occurrence mentioned in the evidence directly caused or directly contributed to cause.  You must state such total amount of plaintiff's damages in your verdict.

In determining the total amount of plaintiff's damages, you must not reduce such damages by any percentage of fault you may assess to plaintiff. *The judge will compute plaintiff's recovery by reducing the amount you find as plaintiff's total damages by any percentage of fault you assess to plaintiff.*

(Emphasis added).  This instruction was patterned after MAI 37.03 (1986 New).  The italicized portion of Instruction Number 9 correctly states Missouri law on how the trial court must use the percentage of fault assessed to the plaintiff to reduce his or her total damages to compute the plaintiff's recovery.

Here, the jury found that Gilmore's *total damages* were $1,250,000 and that he was 22% at fault.  The trial court correctly computed Gilmore's recovery by reducing the amount the jury found as total damages by the percentage of his fault assessed by the jury.  That is consistent with the language of section 537.610.2 because this statute does not set a limit on the amount of damages a jury could find, only a cap on the total legal responsibility (i.e., liability) of a public entity.  Since the $975,000 damages award exceeded the amount for which Children's Division could be legally responsible pursuant to section 537.610, the trial court further reduced Gilmore's recovery to the maximum allowed by the statutory cap.

This result is consistent with the approach taken by other state appellate courts, which reduce a plaintiff's award of damages by his or her comparative fault and then apply the statutory cap on damages.  *See, e.g.*, **McAdory v. Rogers**, 215 Cal.App.3d 1273, 1279-81 (Cal. App. 1989) (holding that there was "no legitimate or logical reason for reducing [the non-economic damage] award to the $250,000 cap . . . *before* reducing it further due to Mrs. McAdory's 22 percent comparative fault"); **Alhilo v. Kliem**, 412 P.3d 902, 915 (Colo. App.

13

2016) (holding that Colorado's statutory cap on noneconomic damages "does not cause a plaintiff's noneconomic damages to disappear – it merely limits a plaintiff's recovery to a specified maximum amount"); *Brown v. Crown Equip. Corp.*, 960 A.2d 1188, 1195 (Me. 2008) (holding that the reduction for comparative fault occurs before the application of a statutory cap on consortium damages); *Rodriguez v. Cambridge Hous. Auth.*, 795 N.E.2d 1, 9 (Mass. App. 2003) (holding that statutory cap on the liability of a public employer "should be applied after, and not before, the reduction for a plaintiff's own negligence"); *Guiliani v. Shehata*, 19 N.E.3d 971, 979 (Ohio App. 2014) ("applying comparative negligence before the statutory-damage limit does not frustrate the purpose of comparative-negligence principles").

Thus, the trial court did not err in reducing the jury's award of damages of $1,250,000 by 22% (Gilmore's comparative fault), rather than reducing the statutory cap of $441,130 by 22%. Point 4 is denied.

## Conclusion

The trial court's judgment is affirmed.


MARY W. SHEFFIELD, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

DON E. BURRELL, J. – CONCURS

14